[No. B156032. Second Dist., Div. Eight. Mar. 4, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM ROBERT SALES, Defendant and Appellant.

COUNSEL

Steffan Imhoff, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Marc E. Turchin and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**FLIER, J.**—William Robert Sales is appealing his conviction after a jury found him guilty of attempted extortion (count IV). We find that there was insufficient evidence of attempted extortion and reverse on that basis, without addressing appellant's other issues.

## PROCEDURAL HISTORY

Count I of the information filed on October 11, 2001, charged appellant with kidnapping (Pen. Code, § 207, subd. (a)).[1] Count II alleged forcible sodomy (§ 286, subd. (c)(2)). Count III alleged forcible oral copulation (§ 288a, subd. (c)(2)). Count IV alleged attempted extortion (§ 524). Count V alleged kidnapping for ransom, reward, or extortion (§ 209, subd. (a)). The information further alleged that appellant had suffered three prior convictions for the purpose of the "Three Strikes" law (§§ 1170.12, subds. (a)–(d), 667, subds. (a)(1), (b)–(i)), consisting of two federal convictions for bank robbery and one state conviction for robbery (§ 211). An additional enhancement under section 667.5, subdivision (b), alleged that appellant had served a prior prison term for the crime of forgery (§ 475a).

Jane Doe No. 1 was the alleged victim on counts I, II, III and V. Jane Doe No. 2 was the alleged victim of the attempted extortion charged in count IV.

Appellant proceeded in propria persona at his jury trial. He waived a jury as to the prior convictions. The jury found him guilty solely on count IV, attempted extortion. It deadlocked on the remaining counts, as to which a mistrial was declared.[2] Appellant then admitted the prior convictions.

On January 14, 2002, appellant was sentenced to 25 years to life for attempted extortion under the Three Strikes law. He filed a notice of appeal that same day.

On February 11, 2002, appellant entered into a plea disposition with the People regarding the counts on which the jury had deadlocked. He agreed to an additional consecutive sentence of 10 years in state prison, based on a guilty plea to count I, kidnapping, with one prior serious and violent felony. His total sentence was therefore 35 years to life in state prison.

---

[1] All subsequent code citations are to the Penal Code unless otherwise specified.

[2] When the jury was polled, it indicated that the split was 11 to one for guilty on count I, 11 to one for guilty on count II, eight to four on count III, and 11 to one for guilty on count V.

## FACTS

*Prosecution Testimony*

The jury deadlocked on the charges involving Mischele C., who was Jane Doe No. 1. Its guilty verdict on count IV concerned Mischele's roommate, Mary V., who was identified as Jane Doe No. 2. Despite the lack of a verdict as to Mischele, her testimony is necessary to understand the verdict regarding Mary.

Mischele testified that she was walking down Garvey Avenue in El Monte at 10:00 or 11:00 p.m. on June 6, 2001. She was a heroin addict and prostitute, and had used heroin earlier that day. However, she was not working that night. A Cadillac pulled up next to her. Appellant was in the passenger seat; another man was driving. Appellant asked if she knew "Coneja." Mischele told him she knew Coneja, had not seen her, and wanted to be left alone, as she was not working. Appellant got out of the car and walked up to Mischele. He told her to "get in the f---ing car." Mischele got into the back seat because she was afraid.

As they drove around in the car, appellant told Mischele his name was "Billy Bob" and the driver's name was "Danny." He said he had just been released from prison and was a member of the Mexican Mafia. Mischele knew the Mexican Mafia was a prison gang with a reputation for violence and crimes. She had heard of "Billy Bob" and was familiar with the names of other gang members appellant mentioned. He told her the Mexican Mafia was not happy that prostitutes and drug dealers in the area were not paying "taxes" to it. He intended to change that, so Mischele was going to have to work for him as a prostitute and pay him $200. He talked with Danny about taking her to Victorville, in the desert. Afraid she would be killed if they drove to the desert, she suggested they go to her nearby apartment. She was hoping she could escape or get help from her roommate Mary and Mary's boyfriend, Eddie.

When they got to the apartment, appellant handed Danny a backpack and said, "If anybody gets out of hand up here, Danny, blow them away." They entered the apartment and found Mary and Eddie inside. Mary was a former prostitute. Appellant ordered Eddie into the bedroom while he talked to Mischele and Mary in the living room. He asked Mary if she was currently working as a prostitute. She told him she had stopped, as her boyfriend took care of her. Appellant told Mary she would suffer consequences if he found out she was currently working in that profession. She would never know when he would be there, but he would have a crew of people checking the street, and everybody who was working there would have to pay him.

Appellant called Eddie out of the bedroom. He said he would be coming around often, that Mischele was going to belong to him, and that he would use the bedroom with her when he was there. He made Mischele spend the rest of the night with him in the bedroom. During that time he forced her to orally copulate him and submit to painful anal intercourse. He hit her, pulled her hair, and threatened to tie her up with an electrical cord. She managed to run out of the house around 7:00 a.m., and called the police from a nearby gas station. Appellant walked by as she was talking to the police at the station. She pointed him out, and he was arrested.

The police observed that Mischele was scared, upset, and crying. She gave the police and a nurse at the hospital essentially the same version of the events as she told the jury. Her anal area showed signs of recent trauma. However, no semen was recovered. She moved out of the state after appellant's friend Danny came to her door and threatened to harm her because she had appellant arrested.

Since Mary's whereabouts were unknown at the time of trial, the transcript of her preliminary hearing testimony was introduced into evidence. Mary testified there that she and Eddie saw appellant and Danny in the living room with Mischele. Appellant called Mary into the living room and told Danny to go to the bedroom. He told Mary and Mischele that he planned to collect money for the Mexican Mafia from the prostitutes who were working out on the street. He said that he could have Mischele work for him and make him $200. He asked Mary if she was currently working as a prostitute. Mary told him that she had been a prostitute in the past but had stopped that activity, as her boyfriend would not allow it and she wanted to lead a clean life. Appellant told Mary that it was "okay" if she wanted to straighten out her life, but if he heard she was working out on the street or selling drugs, he would make sure he collected half of what she collected.

Mary observed that Mischele was nervous and shaking her head. Appellant said Mischele was going to be his girlfriend and sleep with him in the bedroom every time he was there. He forced Mischele to go into the bedroom with him. Mary did not sleep that night. When she entered the bedroom the next morning to get her clothes, she saw appellant and Mischele on the bed together. Mischele looked upset, and escaped out the back door.

There was also testimony at the trial from a police expert on gang activity. He stated that the Mexican Mafia was a prison gang whose members also committed violence outside the prison. People on the street generally feared the Mexican Mafia, whose members included people from El Monte. The officer acquired information about appellant through contacts with appellant, gang investigators at the prison, and sheriff's department gang investigators.

He learned that appellant sometimes used the name Billy Bob and had been in the Mexican Mafia around 1994, although he was no longer in the gang.

*Defense Testimony*

Appellant testified that Mischele approached him at the bus station and asked him if he wanted a date. He told her he had no money. Since he had missed the last bus, which would take him to a rehabilitation facility in Pasadena, she offered to let him spend the night at her home. They went there, she introduced him to some people, and he fell asleep on the couch. He awakened the next morning when a man was trying to steal his wallet. He left, and was arrested by the police near the gas station. He admitted that he had an extensive history of prior felony convictions and prison commitments, but denied being a member of the Mexican Mafia.

Appellant's ex-wife testified that she dropped him off in West Covina with a backpack, which contained personal items. He was supposed to take a bus to Pasadena and enter a rehabilitation facility there the next morning.

*Prosecution Rebuttal Testimony*

Appellant told the police that he had at one time belonged to the Mexican Mafia.

## DISCUSSION

"In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. . . . The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. . . ." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053 [99 Cal.Rptr.2d 1, 5 P.3d 68], citations omitted; 6 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Criminal Appeal, § 147, p. 394.)

Applying the requisite analysis, we find insufficient evidence of attempted extortion, the sole crime that resulted in a guilty verdict.

The only evidence of the attempted extortion of Mary was the conversation appellant had with her and Mischele in the living room. Mary's preliminary hearing testimony, during direct examination by the prosecutor, reads:

"Q What questions was he asking you?

"A He was asking me about me working, being a prostitute. And I told him no, that I was at one time, but I wasn't anymore because my boyfriend wouldn't allow me.

"Q What else did he say?

"A He told me what, he told us that he was from the Mafia and that he was here to do what he's supposed to do to collect from everybody that's working out on the street or selling drugs.

"Q When he said 'collect,' what did you understand that to mean?

"A Okay. Well, collect when you say taxes.

"Q Is that money?

"A Yes. Yes, sir.

"Q So he told you he wanted to collect money?

"A Mm-hmm.

"Q And you said 'for the Mafia.' Did he identify what kind of Mafia it was or—

"A No, he didn't. He said EME.

"Q He said the EME. Is that E-M-E to your knowledge?

"A To me it's the Mafia.

"Q Okay. Now, were both of you sitting there when he said that, both you and your roommate?

"A Yes, sir.

"Q What else did he say to you or to you and your roommate?

"A He said that—first of all he told her that if he wanted he could have her go out there and make him $200.

"MR. KWATCHER [defense counsel]: Objection, hearsay. Move to strike.

"THE COURT: I'm sorry. What's the objection?

"MR. KWATCHER: Hearsay.

"THE COURT: That's still a party admission. Overruled.

"Q BY MR. DONES [the prosecutor]: Go ahead, Ma'am.

"A He said that he could have her go out there and make him $200. And we looked at each other and we said, $200? She barely gets enough to get by. And then he told me about working the street and stuff, and I told him I wasn't working the street and that I didn't want to work the street anymore. And, you know, because I wanted to start a clean life. [¶] And he was looking at me and I was looking at him in the eye, and *he told me that, okay, if I really wanted to straighten out my life, okay. But if he hears anything of me working the street or selling drugs, that I was going to hear it from him, and he was going to make sure he collects whatever I make, half of what I collect.*" (Italics added.)

Mary's preliminary hearing testimony about the conversation was corroborated by Mischele's trial testimony. Mischele testified that when appellant asked Mary if she was currently working as a prostitute, she told him she had given up the profession. Appellant told Mary that if he later found out she was working the streets, she would suffer consequences, and he would demand payment.

Viewed in the light most favorable to the People, the only reasonable inference from this evidence is that appellant threatened to extort money from Mary if she returned to working as a prostitute *in the future*. The conversation showed the preparation stage of a possible future crime, and did not establish the crime of attempted extortion.

■ Extortion is defined in pertinent part by section 518 as "the obtaining of property from another, with his consent, . . . induced by a wrongful use of force or fear . . . ." This crime, which is sometimes called "blackmail," differs from robbery in that the property is obtained with the consent of the victim. (2 Witkin & Epstein, Cal. Criminal Law, *supra*, Crimes Against Property, § 103, p. 135.)

Appellant was convicted of violating section 524. It punishes "[e]very person who attempts, by means of any threat, such as is specified in Section 519 of this code, to extort money or other property from another . . . ." The pertinent threat specified in section 519 is that of "an unlawful injury to the person or property of the individual threatened . . . ."

■ The elements of the crime of attempted extortion are (1) a specific intent to commit extortion and (2) a direct ineffectual act done towards its commission. (*People v. Franquelin* (1952) 109 Cal.App.2d 777, 783 [241 P.2d 651] (*Franquelin*); 1 Witkin & Epstein, Cal. Criminal Law, *supra*, Elements, § 53, p. 262.)

■ Preparation alone will not establish an attempt. There must be " 'some appreciable fragment of the crime committed [and] it must be in such progress that it will be consummated unless interrupted by circumstances independent of the will of the attempter . . . .' " (*People v. Camodeca* (1959) 52 Cal.2d 142, 145 [338 P.2d 903] (*Camodeca*); 1 Witkin & Epstein, Cal. Criminal Law, *supra*, Elements, § 54, p. 263.)

Convictions for attempted extortion were affirmed in *Camodeca* and *Franquelin* on facts that show what was missing in the case at bench.[3]

*Camodeca* involved a conviction for two crimes, attempted grand theft and attempted extortion. The defendant there held a contract of sale and collected monthly payments on a bar which was owned and operated by the victim, Murphy. On June 15, 1957, Murphy told the defendant he wanted to have the name of his "common-law wife" removed from the contract of sale and the bar's liquor license. The defendant said he could arrange this with a "fix." He also asked Murphy to give him money so that he could "fix" certain charges he asserted had been filed against the bar. Murphy was unable to raise the money, and contacted the district attorney. At a secretly-recorded meeting on June 18, Murphy told the defendant that he did not have the money. The defendant said the "fix" had already been paid by an unnamed man who would be "unhappy" if Murphy did not promptly reimburse him.

*Camodeca* first found that the defendant's behavior established attempted grand theft. His conduct exceeded preparation and constituted unequivocal action towards commission of the crime, as when he met with Murphy on June 18, the only further act necessary was actual receipt of the money. (*Camodeca, supra,* 52 Cal.2d at p. 145.) The fact Murphy was no longer deceived at the time of the June 18 meeting was an intervening circumstance unknown to the defendant. The crime was established because the defendant's guilty intent was coupled with action that would have resulted in a crime, but for that intervening circumstance. (*Id.* at p. 147.)

*Camodeca* then turned to the sufficiency of the evidence of attempted extortion. It focused on the June 18 meeting, where the defendant told Murphy that if he did not reimburse the money, he would be jeopardizing the

---

[3] Appellant's briefing emphasizes *Scheidler v. National Organization for Women, Inc.* (2003) 537 U.S. 393 [154 L.Ed.2d 991, 123 S.Ct. 1057]. The facts of *Scheidler* appear less applicable to this case than those of *Camodeca* and *Franquelin*.

bar, and might as well close it. Those words established attempted extortion, as they contained a reasonable inference "that defendant intended to secure money from Murphy by threatening to procure the revocation of his license or otherwise interfere with his business by unlawful means. The evidence supports the implied finding that defendant attempted to place Murphy in fear of unlawful injury to his business or his person if the money was not paid to him, and thus sustains the conviction of attempted extortion." (*Camodeca, supra,* 52 Cal.2d at p. 148.)

The defendant's words in *Camodeca* were clearly intended by the defendant to produce an immediate payment of money, rather than a payment only in the event of a possible future occurrence, as in the case at bench. It is also apparent that the combination of the June 15 and June 18 discussions with Murphy resulted in much more progress towards consummation of the crime than the brief conversation with Mary in this case.

Respondent emphasizes this language from *Camodeca*: "When it is established that the defendant intended to commit a specific crime and that in carrying out this intention he committed an act that caused harm or sufficient danger of harm, it is immaterial that for some collateral reason he could not complete the intended crime. Although the law does not impose punishment for guilty intent alone, it does impose punishment when guilty intent is coupled with action that would result in a crime but for the intervention of some fact or circumstance unknown to the defendant." (*Camodeca, supra,* 52 Cal.2d at p. 147.) The principle is a correct statement of law but does not apply to the facts here. Appellant knew from questioning Mary that she was not currently working as a prostitute. That was "okay," and he did not expect money from her, unless she returned to that profession. The crime was not completed because the threat was withdrawn, rather than because of some fact unknown to the defendant.

*Franquelin, supra,* 109 Cal.App.2d 777, is another attempted extortion case with instructive facts. The victim there was a former prostitute who engaged in sexual intercourse with the defendant on several occasions because he claimed to be on the vice squad. He then demanded that she give him $250, or a friend of his would turn her in. He told her he would ring her doorbell and wait for her in her car the next evening. She contacted the police, who gave her money to give the defendant and installed a bug in her car. The defendant rang the doorbell the next evening and they got into the car, but she was unable to activate the bug. He got out of the car to get cigarettes and was arrested by the police, so he was not given the money.

The *Franquelin* court defined preparation as "devising or arranging the means or measures necessary for the commission of the offense." (*Franquelin, supra,* 109 Cal.App.2d at p. 784.) It found that the actions of the

defendant there went beyond mere preparation from the point when he rang the doorbell. Execution then commenced, as he "did all acts necessary to commit extortion except receive the money." (*Ibid.*)

In contrast, appellant's conversation with Mary here did not even rise to the level of preliminary arrangements.

Respondent extensively discusses *People v. Charles* (1963) 218 Cal.App.2d 812, 819 [32 Cal.Rptr. 653] (*Charles*), which concerned a conviction for attempted pandering. The defendants there drove two cocktail waitresses home from a bar, using the ride as an opportunity to invite the girls to work for a house of prostitution. They continued urging the girls to accept the offer while visiting them at their apartment and in five subsequent telephone conversations. The girls contacted the police, who arranged to be present but in hiding at a meeting between the girls and the defendants. The police overheard the defendants give the girls extensive details of the proposed arrangement. Following their conviction, the defendants contended on appeal that the evidence was insufficient to establish attempted pandering. They maintained that the evidence showed only intention and preparation, and was also deficient because it did not show the existence of a house of prostitution and the placement of the girls inside it. The *Charles* court disagreed. The crime was established by evidence of specific intent plus direct, unequivocal acts towards the criminal end, which was frustrated by the extraneous circumstance that the women refused to work as prostitutes.

By analogy to *Charles*, respondent argues that appellant was guilty of attempted extortion because his intent to extort money from Mary was frustrated by the extraneous circumstance that Mary refused to work for him as a prostitute. The analogy fails because the crime of extortion requires a threat, and appellant removed the threat once he learned that Mary was no longer working as a prostitute. He did not force her to give him money at that point. He told her it was "okay" if she wanted to straighten out her life, from which it must be inferred that the attempt to use threats to obtain property was gone, unless circumstances changed in the future and she returned to the streets.

It is also important that the defendants in *Charles* had many more acts towards accomplishment of their criminal purpose than existed in the case at bench. The facts here are more like those of *People v. Orndorff* (1968) 261 Cal.App.2d 212, 215–216 [67 Cal.Rptr. 824], which reversed a conviction for attempted grand theft, under facts showing that the defendant pulled out of a bunco scheme as the victim walked towards the bank. Here, as in *Orndorff*, there was insufficient evidence of an attempt, because appellant abandoned his scheme before it had had reached a significant step.

## DISPOSITION

The judgment is reversed and remanded with instructions to enter a judgment of acquittal as to count IV.

Cooper, P. J., and Rubin, J., concurred.