IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 2007 Session

## JERRAL D. PARRIS v. STATE OF TENNESSEE

**Appeal as of Right from the Circuit Court for Warren County
No. F-9916   Larry B. Stanley, Jr., Judge**

---

**No. M2006-00148-CCA-R3-CD - Filed March 15, 2007**

---

The Defendant, Jerral D. Parris, was indicted on two counts of extortion.  A Warren County jury convicted the Defendant of two counts of attempted extortion.  On appeal, the Defendant alleges the following: (1) attempted extortion is not a crime in Tennessee; (2) there was insufficient evidence to convict the Defendant of attempted extortion; (3) the trial court improperly denied a motion for a change of venue; (4) the trial court erred in refusing to allow the Defendant to test and inspect audio tape evidence; (5) the trial court erred in not declaring a mistrial after the Defendant was compared to a notorious murderer; (6) the trial court erred by failing to instruct the jury as to the affirmative defense to extortion; and (7) the trial court erred in sentencing the Defendant.  After a thorough review of the record and applicable law, we determine that attempted extortion is a crime in Tennessee and that there was sufficient evidence to convict the Defendant of this crime.  His conviction, however, must be reversed because the trial court improperly refused to allow a jury instruction on an applicable affirmative defense.  Thus, we reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

Patrick G. Frogge (on appeal), Nashville, Tennessee, and Charles P. Dupree (at trial), Chattanooga, Tennessee, for the Appellant, Jerral D. Parris.

Robert E. Cooper, Jr., Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Dale Potter, District Attorney General; Thomas J. Miner, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION
I.  Facts**

This appeal arises from the Defendant's conviction by a Warren County jury of two counts of attempted extortion. The facts relevant to this appeal are as follows:

## A. Motions

Prior to trial, the defense made a motion to change venue due to one of the victim's position in the community as the sitting General Sessions Judge in Warren County, where this case was tried. The Defendant alleged that general members of the community would be frequently in front of Judge Ross, and it would be difficult to voir dire concerning that issue without putting ideas into the potential jurors' heads. The motion was overruled.

Additionally, prior to trial, while the Defendant was proceeding pro se, the Defendant made a motion to obtain a copy of the audio tape recordings that were to be used in the trial. That motion was not ruled upon, but the Defendant did obtain copies of the tapes from the State. Following trial, the Defendant moved to examine the original audio tapes stating that he suspected tampering. That motion was denied by the trial court, who stated the motion should have been made before trial.

## B. Guilt Phase

Of the Defendant's two counts of extortion, one concerned his actions towards Tami P. Ross, and the other concerned his actions towards Judge Larry G. Ross, Tami Ross's husband.

The State's first witness, Leeann Redmon, testified that she was Tami Ross's legal assistant. Her responsibilities included answering the phone, making appointments, and speaking with clients. She became familiar with the Defendant through her job, and, on March 2, 2004, he brought a package to Tami Ross's office. The package contained papers, which Redmon examined. Upon reading the papers, Redmon became concerned and called Tami Ross. Redmon left the documents for her boss, who presumably picked up the documents when she came back into the office after Redmon had gone home for the day. The next morning, Redmon returned to work and, throughout the day, received three phone calls from the Defendant wishing to speak with Tami Ross. At some point, Tami Ross returned the Defendant's phone call, and the Defendant later visited that office. At the office, the Defendant met with Tami and Judge Ross, and upon the conclusion of the meeting the Defendant was arrested.

On cross-examination, Redmon stated that the Defendant was pushy in his phone calls the day of his arrest. Additionally, Redmon described the layout of the office and admitted someone could hear her telephone conversation if they were sitting on the sofa in the reception area.

Tami Ross testified she is an attorney, and she primarily works in the area of family law, and her husband is the General Sessions Judge in the county. Irina Parris ("Parris") came to Tami Ross in order to file a complaint of divorce against the Defendant. Tami Ross aided her in so doing and represented her in the divorce proceedings. The Defendant was initially represented by an attorney, but that attorney was fired after the Defendant lost the initial "battle" for temporary custody. The

Defendant proceeded pro se and apparently had a reasonable working knowledge of the general course of proceedings because he filed motions, subpoenaed witnesses, and conducted discovery. During these proceedings, Tami Ross learned that the Defendant was worth over one million dollars. The divorce was finalized on February 6, 2004, and on February 17 the Defendant filed a motion to alter or amend the judgment. Tami Ross discussed the motion with Parris, who stated she did not want to change anything in the final property disposition. Tami Ross then advised the Defendant that his only option was to appeal the ruling.

Tami Ross further testified that on March 1, 2004, she was in court. She received a call from her secretary, Redmon, who told her that the Defendant had delivered a package. Tami Ross instructed Redmon to leave the package on her desk so she could examine it when she returned. Tami Ross recognized the Defendant's signature and reviewed the documents. The letter made settlement demands including property, reduction in child support, attorney's fees, and other fees. The second page of this letter began with the sentence, "I follow this request with incentives for its early acceptance."

After the letter, two photographs were included that were of a marquee. One side stated, "Judge Jeff Stewart ignored suffering child - Whitney Duran says 'Lesson Number 1.'" The other side stated, "Lawsuit filed against Ross - 'trauma upon children' - time for change." Following the pictures was a map with cities circled. Those were the cities where the Grundy County judge would run for election. Following the pictures and map were two complaints, one against Parris and one against Tami Ross. Tami Ross discussed the situation with her husband, Judge Ross, because she felt it threatened her livelihood. The next day, the Rosses determined they should contact law enforcement, but they could not get in contact with the district attorney. The Defendant repeatedly called and demanded that Tami Ross return his call. Because they could not get in touch with the District Attorney, Tami Ross and her husband went to Radio Shack and bought a listening devise to record the next phone conversation.

Tami Ross called the Defendant, and they discussed the documents that had been delivered to Tami Ross.[1] During the conversation, the Defendant repeated his requests and stated that he would campaign against Judge Ross and file the two lawsuits if those requests were not fulfilled. The Defendant also stated that he had the witnesses and documentation to backup his promises of lawsuits and campaigning. After the conclusion of the phone conversation, Tami Ross stated she felt as if the Defendant wanted her to sell out her client. The Rosses were then able to contact the authorities, and members of the Tennessee Bureau of Investigation ("TBI"), the District Attorney's Office, and the Warren County Sheriff's Office all came to Tami Ross's law office. Subsequently, another phone call was made, and the Defendant came to the office. The Defendant met with Judge Ross, and when they walked outside the office the Defendant was arrested.

On cross-examination, Tami Ross testified that the Defendant had filed many motions at the divorce trial, and he and his wife could not agree on many things. Tami Ross and the Defendant had

---

[1]A tape of the conversation was entered into evidence and played for the jury.

negotiated both the property division and the parenting plan. After the property division and the parenting plan had been ruled on by the judge, the Defendant contacted Tami Ross in a persistent attempt to adjust the settlements more to his liking.

Addressing the specific requests, Tami Ross admitted that she did not know that the piece of land the Defendant demanded was landlocked, and Parris would be required to traverse his land to get to it. Additionally, the fee that was owed to the Department of Labor was applied via lien to a piece of property that the Defendant and Parris had split. The Defendant requested that Parris pay her half of the fee if she was to get half of the land. In addressing the complaint addressed to her, Tami Ross stated that the general complaint was that she somehow prevented the Defendant from adequate visitation with his children, and, although she thought the complaint was frivolous, she did not want to hire an attorney to defend her. However, her main concern was that the Defendant was attempting to get her to persuade her client to do something she did not want to do. Tami Ross admitted that filing the lawsuits against both her and her client were within the rights of the Defendant. Tami Ross did not feel as though this was a pre-appeal negotiation; rather, she thought it was extortion.

On re-direct examination, Tami Ross testified that a lawsuit filed against her could go on for a year or more, and the marquee could stay up indefinitely. On re-cross examination, Tami Ross admitted that everything the Defendant threatened to do was legal.

Judge Larry Ross testified he was aware of, but not involved in, the Parris' divorce. The package delivered to Tami Ross was actually addressed to him. He reviewed the contents and called the Administrative Office of the Courts, who directed him to local police. Judge Ross attempted to contact the District Attorney's Office and the TBI, but to no avail. Feeling pressure from the Defendant's persistent calls, Judge Ross and his wife got a recorder from Radio Shack and recorded the next phone conversation. A second phone call was made to the Defendant, which was also taped.[2] Judge Ross and the Defendant discussed where the two should meet, and the following exchange took place:

> **Defendant**: I don't want to do anything illegal on or off the phone. I'm not a criminal.
>
> **Judge Ross**: Well I understand.
>
> **Defendant**: I've never been. I never will be.
>
> **Judge Ross**: What you're asking me to do could make me lose my license and get me disbarred.
>
> **Defendant**: Don't do anything.

---

[2]A tape recording of this phone conversation was played to the jury.

**Judge Ross**: Okay. So you don't want me to - -

**Defendant**: I want you to talk with me. I want Tami to respond to my letter.

**Judge Ross**: Uh huh.

**Defendant**: I'm not asking anybody to do anything illegal.

**Judge Ross**: Well, as a public official and as a lawyer, if I get involved in something I don't have any business in, it could be for me.

**Defendant**: Don't do it. Don't do it.

The Defendant and Judge Ross then met together at Tami Ross's law office.[3] At that meeting, Judge Ross and the Defendant came to an agreement that if Judge Ross would attempt to persuade his wife to settle the case favorably the Defendant would not campaign against Judge Ross and would not file any lawsuits against Tami Ross or Parris.

On cross-examination, Judge Ross testified that he viewed the situation as a threat that if he did not pressure his wife to settle the Defendant's case favorably then the Defendant would ruin his political career. Judge Ross also stated that he was in fear of physical harm because the Defendant once pointed his finger at Tami Ross and told her, "you are at risk." However, Judge Ross admitted the Defendant never stated exactly for what she was at risk. Judge Ross said he felt entitled to believe that the Defendant was physically threatening his wife because:

> [I]t's based on prior cases I've worked. I worked a murder of an attorney right over here across the street in a similar situation with a man very similar to this guy who had a problem over a deed who walked in and shot him five times in his office one morning. Very similar situation, very similar man. In fact, we talked about it and all the officers agreed, this man is just like J.B. McCord.[4] That's what I was concerned about. (footnote inserted)

After this statement, defense counsel moved for a mistrial due to Judge Ross comparing the Defendant to J.B. McCord. The trial court declined to declare a mistrial, and instead it gave a clarifying instruction.

---

[3]Judge Ross was wired for sound recording, and a tape of the meeting was played for the jury.

[4]J.B. McCord is an apparently infamous murderer in the McMinnville area. For general information concerning J.B. McCord, see State v. J.B. McCord, No.03C01-9403-CR-00110, 1997 WL 732513 (Tenn. Crim. App., at Knoxville, Nov. 26, 1997), *Tenn. R. App. P. 11 application denied* (Tenn. Oct. 12, 1998).

-5-

Judge Ross admitted that, at times, cases do settle prior to an appeal. Additionally, there is nothing that Judge Ross could have personally done in this situation except pressure his wife; there was nothing he could do legally in his position as a judge. However, Judge Ross drew an analogy, describing the situation as if "someone call[ed] someone who is going to serve on the jury and sa[id] I want a particular plea [in] that case and unless you do it I'm going to make your husband lose his job[,] or I'm going to call and put your husband's name in the paper."

The Defendant testified he was generally in the construction business. Although he began his divorce proceedings with an attorney, he represented himself the majority of the time. The Defendant described his interaction with the judge on his case, Judge Stewart, saying, "I don't think I was his favorite person." Additionally, the Defendant repeatedly asked Judge Stewart to prevent Parris and Tami Ross from discussing the divorce in front of his children. Judge Stewart never acted on those requests. Once the court ruled on the Defendant's case, the Defendant prepared an appeal, but, due to the cost of prosecuting an appeal, he contacted Tami Ross in an attempt to mediate and settle the case. Tami Ross told him to come to her office, which the Defendant did. While there, the situation apparently became heated, and the Defendant, from about five feet away, told Tami Ross she was "putting herself at risk" for, in his mind, a lawsuit. She stated she would call the police, and the Defendant responded she could call the National Guard if she wanted to, and he left his card for her. At this point, the Defendant testified, he felt he had no other choice but to exercise his First Amendment rights to publicize his discontent with the judicial system via the marquee. Overall, the Defendant simply wanted to sit down and work out a reasonable compromise.

On cross-examination, the Defendant testified he had obtained approximately fifteen to twenty federal government contracts for construction work. The Defendant stated he was essentially broke due to his mortgage and child support. However, the Defendant had trouble explaining exactly what he was worth. The Defendant admitted he wished to settle the case prior to filing an appeal.

After the completion of proof, the judge instructed the jury on extortion and attempted extortion. In addressing the defense request that the jury be instructed on the affirmative defense of restitution, the trial court stated, "I don't think the evidence in this case preponderates in favor of finding that they met either one of those burdens of why he was claiming restitution or whatever it was on a legitimate basis." The jury returned with verdicts and found the Defendant not guilty of the two counts of extortion but guilty of the two lesser-included counts of attempted extortion.

## B. Sentencing Phase

At the sentencing hearing, Tami Ross testified that she disputed the Defendant's assertion that he was a non-violent man and no violence was involved in this case. The Defendant once came to her office and told her she was at risk. She called the police because she felt threatened. Additionally, the Defendant was argumentative when he would call on the telephone. At that point, Tami Ross sent the Defendant a certified letter telling him not to call or come by her office, and any correspondence should be mailed or faxed. Tami Ross also felt threatened because she knew that Parris, the Defendant's ex-wife, had a restraining order placed on him.

Additionally, the Defendant alleged he did not have a questionable business reputation, and Tami Ross disputed this stating she knew of a fine against the Defendant by the Department of Labor for employing minors at inappropriate hours. Additionally, it appeared that the Defendant had been investigated by the Department of Labor three times from 1980 to 1987 for failure to pay back wages. The Defendant further published articles in his newspaper, The Front Page, which referenced Tami Ross and Judge Stewart's actions in relation to the divorce.

On cross-examination, Tami Ross also admitted she never complained to the judge in the divorce case about the Defendant's actions at her office. Tami Ross also conceded she had no firsthand knowledge of the Defendant's business reputation in Grundy County. On re-direct examination, Tami Ross testified that the Defendant's business reputation in Grundy County was not good. On re-cross examination, Tami Ross admitted that, in the divorce proceedings, she believed that the Defendant was successful and would continue to be successful.

Donna Dunlap testified that she prepared the pre-sentence report for this case. She had some trouble getting in touch with the Defendant, frequently calling his office and only reaching his secretary. While she normally met with individuals face to face, she merely spoke with the Defendant over the phone in this case. Dunlap noted that the Defendant did have a misdemeanor assault conviction in 1981.

On argument, the defense requested judicial diversion so the Defendant's business, construction through government contracts, would not be hampered. The State argued this was a crime against the entire judicial system. After hearing arguments, the Court found the enhancing factors set forth by the State were minor and sentenced the Defendant to one year on each count, to run concurrently. In determining whether to grant probation or judicial diversion, the trial court considered the fact that the Defendant threatened the victims physical harm when he said, "You are at risk." Additionally, attempting to get a lawyer to sell out a client by offering money or a job was "abhorrent." It found confinement was needed to provide a suitable deterrent to others. Judicial diversion, as a result, would not be appropriate. The Defendant was sentenced to serve 210 days in jail with the remainder of his sentence to be served on probation.

## II. Analysis

The Defendant has alleged the following errors: (1) attempted extortion is not a crime in Tennessee; (2) there was insufficient evidence to convict the Defendant of attempted extortion; (3) the trial court improperly denied a motion for a change of venue; (4) the trial court erred in refusing to allow the Defendant to test and inspect audio tape evidence; (5) the trial court erred in not declaring a mistrial after the Defendant was compared to a notorious murderer; (6) the trial court erred in not allowing a "just compensation" jury instruction to be given; and (7) the trial court erred in sentencing the Defendant.

### A. Attempted Extortion

In the Defendant's first assignment of error, he alleges he cannot be convicted of attempted extortion due to the fact that attempted extortion is not a crime in Tennessee. This question appears to be an issue of first impression in Tennessee. Because this is purely a question of law, our review is de novo. Whaley v. Perkins, 197 S.W.3d 665, 670 (Tenn. 2006). Extortion in Tennessee is statutorily defined as follows: "A person commits extortion who uses coercion upon another person with the intent to: (1) obtain property, services, any advantage or immunity; or (2) restrict unlawfully another's freedom of action." T.C.A. § 39-14-112 (2006). The Sentencing Commission Comments provide the following additional guidance: "Because the harm is the use of coercion for the above purposes, the offense is committed even though the offender's efforts are unsuccessful and, for example, do not result in obtaining any property." Id. at Sentencing Comm'n Cmts. We observe that "coercion" is defined in the Code as:

> [A] threat, however communicated, to:
>> (A) Commit any offense;
>> (B) Wrongfully accuse any person of an offense;
>> (C) Expose any person to hatred, contempt or ridicule;
>> (D) Harm the credit or business repute of any person; or
>> (E) Take or withhold action as a public servant or cause a public servant to take or withhold action

T.C.A. § 39-11-106(3) (2006). Tennessee Code Annotated section 39-12-101(a) (2006) further states:

> A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>
>> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
>> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step towards the commission of the offense.[5]

The Defendant alleges that the statute and sentencing commission comments preclude any crime of attempted extortion because, even if the extorter is unsuccessful in obtaining the goal of his

---

[5]See State v. Elder, 982 S.W.2d 871, 875 n.2 (Tenn. Crim. App. 1998) (outlining examples of each criminal attempt subsection).

scheme, he is still guilty of extortion. The Defendant has presented two examples of extortion statutes from other states, and he notes that Florida, with a statute similar to our own, has determined there is no attempted extortion. See Fla. Stat. § 836.05 (1977); Achin v. State, 436 So.2d 30, 30-31 (Fla. 1982). California, on the other hand, requires actual obtainment of property for there to be a completed extortion. See Cal. Pen. Code § 518 (2004); People v. Sales, 10 Cal. Rptr. 3d 527, 532 (Cal. Ct. App. 2004). California has determined that, if eventual possession of the property is required to complete the extortion, then one could attempt to extort by making an ineffectual attempt to possess the property with the specific intent to commit extortion. Sales, 116 Cal. App. 4th at 749.

The Defendant likens attempted extortion to attempted resisting arrest. One is guilty of resisting arrest if he merely attempts to resist, as the actual completion of the resister's goal, to free himself from the officer, is irrelevant. Thus, one cannot attempt to attempt to resist arrest. See State v. William Harlon Adams, No.M2003-02952-CCA-R3-CD, 2005 WL 1353301, at *9-10 (Tenn. Crim. App., at Nashville, June 8, 2005), *perm. app. denied* (Tenn. Dec. 5, 2005). In our view, the analogy is not completely congruous. In determining whether attempted extortion is or is not a crime, it is useful to consider whether there is a hypothetical factual scenario wherein one could commit attempted extortion.

In examining the definition of extortion, we see that first and foremost one must "use coercion." Coercion, being defined as "a threat, however communicated . . . ," provides us with a situation where one could attempt extortion if he makes a threat, but the threat is not communicated to the extortee. For example, an extorter writes a letter to the extortee and leaves the letter on the extortee's desk one afternoon. That night, the building burns to the ground, and the threat, although the extorter attempted to communicate it, goes uncommunicated. Alternatively, an extorter leaves a threat on the extortee's voice-mail. Before the extortee can check his messages and receive the threat, he dies. The uncommunicated threat constitutes an attempt to extort. Once the threat is actually communicated, the crime becomes extortion, irrespective of whether or not the extorter accomplishes his goal. See § 39-14-112, Sentencing Comm'n Cmts. Thus, we conclude that the crime of attempted extortion exists in Tennessee because the crime of extortion does not include every attempt to complete the crime. Having so concluded, we turn to decide whether the evidence in this case was sufficient to support the Defendant's convictions.

## B. Sufficiency of the Evidence

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see Tenn. R. App. P. 13(e); State v. Goodwin, 143 S.W.3d 771, 775 (Tenn. 2004) (citing State v. Reid, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass,13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); Liakas, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978); State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. Goodwin, 143 S.W.3d at 775 (citing State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000).

As noted above, the Defendant could be found guilty of attempted extortion under the criminal attempt statute if he, with the requisite culpability, acted with the intent to cause a result that was an element of the crime extortion. See § 39-12-101(a)(2). More specifically, if the jury concluded that the Defendant acted in a coercive manner to Tami Ross and Judge Ross, he could be found guilty of attempted extortion if he also had the intent to "obtain property, services, any advantage or immunity."[6] T.C.A. § 39-14-112 (2006). While it is clear that the evidence satisfies the intent portion of the statute — the Defendant readily admitted he was attemping to obtain a more satisfactory divorce settlement — whether he acted coercively towards Tami Ross and Judge Ross is less clear. Again, "coercion" is defined as:

> [A] threat, however communicated to:
>      (A) Commit any offense;
>      (B) Wrongfully accuse any person of an offense;

---

[6] We also note that section (c) states, "It is no defense to prosecution for criminal attempt that the offense attempted was actually committed." § 39-12-101(c). Thus, it would be no defense to attempted extortion for the Defendant to claim the crime of extortion was actually committed.

-10-

(C) Expose any person to hatred, contempt or ridicule;
(D) Harm the credit or business repute of any person; or
(E) Take or withhold action as a public servant or cause a public servant to take or withhold action

T.C.A. § 39-11-106(3).

As to Tami Ross, the evidence at trial viewed in the light most favorable to the state showed that the Defendant sent a package to Tami Ross. The letter, actually addressed to Judge Ross, began with, "I am addressing this correspondence to you because I feel you should have some input into decisions that affect your and your wife's future professional and economic well being." A list of demands connected to a divorce which Tami Ross was handling for the Defendant's ex-wife followed, and the letter concluded with, "I follow this request with incentives for its early acceptance." Those incentives included a draft of a complaint against Tami Ross, a draft of a complaint against the Defendant's ex-wife, and a photo of a marquee purporting to be used in a campaign against Judge Stewart, the judge who handled the Defendant's divorce, and Judge Ross.

The complaint against Tami Ross charged intentional infliction of emotional distress due to her failing to advise the Defendant of critical visitation times and dates. As a result of these failures, the Defendant's children "waited and waited, with straining eyes, for your [Defendant] to appear, but he was not allowed to appear because of the above alleged failure of [Tami Ross] to inform him of the scheduled time and place." As a result, the Defendant's children were "led to believe that the word of their Father would not be kept, that their Father did not care for or love them, and that they should not trust their Father." As a result of the emotional distress which ensued, the Defendant prayed for $500,000 in relief.

We conclude a jury could have determined that this complaint exposed Tami Ross to "hatred, contempt, or ridicule" by alleging she improperly prevented a father from seeing his children. Additionally, a jury could have rationally determined it was calculated to harm the business repute of Tami Ross by potentially discouraging persons from hiring her as their lawyer. Thus, there is sufficient evidence for a jury to determine that the Defendant acted by delivering the package, which was intended to coerce Tami Ross to the advantage of the Defendant.

As to Judge Ross, the jury heard evidence that the Defendant stated he would campaign against Judge Ross in the upcoming election if the divorce was not settled to his satisfaction. The purported marquee advertising against Judge Ross is less than conclusive as it merely states, "Lawsuit filed against [Tami] Ross - 'Trauma Upon Children' - Time For Change."[7] However, the letter sent by the Defendant to Judge Ross, listed in its "incentives" an enclosed advertising format

---

[7]The picture of the marquee that was delivered to Tami Ross was entered into evidence. The picture appears to be a photograph of a marquee with the noted phrasing on it. However, what appears to this Court to be "Tami" is in very small lettering compared to the rest of the statement. There was a dispute at trial at to what exactly the marquee said, but we observe four distinct letters, which clearly precludes either "Larry" or "Judge." Further, "Tami" is the logical Ross here due to the previously mentioned lawsuit, and the wording of this particular marquee.

for "Judge Ross."  While campaigning against Judge Ross would not be considered a threat to commit an offense, or wrongfully accuse Judge Ross of an offense, the jury could have concluded that it may bring "hatred, contempt, or ridicule" upon Judge Ross, harm his business repute, or cause Judge Ross, a public servant, to take action in persuading his wife to do something.  While we do not know the specifics of the contents of the campaign against Judge Ross, the jury could have reasonably concluded that it would be similar to that which alleged Judge Stewart ignored a suffering child.  That would suffice to potentially bring "hatred, contempt, or ridicule" on Judge Ross.  Thus, there was sufficient evidence to convict the Defendant of attempted extortion as to Judge Ross.

The Defendant encourages us to adopt a reading of the "coercion" definition to only include unlawful or wrongful acts.  We decline this invitation.  While campaigning and filing a lawsuit in and of themselves are not illegal or wrongful, they may still be the basis for a charge of extortion.  This Court has stated with regards to another generally legal act, picketing, "when the objectives of the picketing changes from legitimate labor ends to personal payoffs, then the actions become extortionate."  Moore v. State, 519 S.W.2d 604, 608 (Tenn. Crim. App. 1974) (quoting United States v. Emmons, 410 U.S. 396, 406 n.16 (1972)).  The Defendant argues that, if his limiting definition were not adopted, one could be convicted of extortion for merely threatening to expose a crooked merchant if that person's money were not refunded.  We feel this type of situation is adequately covered by the affirmative defense to extortion: a reasonable claim for "(1) Appropriate restitution or appropriate indemnification for harm done; or (2) Appropriate compensation for property or lawful services."  T.C.A. § 39-14-112(b) (2006).  The Defendant is not entitled to relief on this issue.

### C. Change of Venue

The Defendant's next allegation of error is that the trial court erred when it declined to change trial venue.  The Defendant admits the change of venue request was not due to pre-trial publicity but merely the profession of one of the victims.  The Defendant alleges that Judge Ross's position as a sitting Warren County General Sessions Judge, with the potential power to sit in judgment over jurors in the future, precluded the Defendant from getting a fair trial.  See Tenn. R. Crim. P. 21.  A trial court's decision to deny a motion to change venue can only be reversed by this court upon a clear showing of abuse of discretion.  State v. Davidson, 121 S.W.3d 600, 611-12 (Tenn. 2003); State v. Dellinger, 79 S.W.3d 458, 481 (Tenn. 2002).  When determining whether a motion to change venue should be granted, a trial court should look to a number of factors, some being concerned with pre-trial publicity.  See State v. Hoover, 594 S.W.2d 743, 746 (Tenn. Crim. App. 1979) (listing seventeen factors, six of which mention "publicity").

The Defendant has not made any specific allegations with regards to the factors listed in Hoover.  Instead, the Defendant essentially alleges that anytime a sitting judge is a victim, the trial must be moved because there is the potential that the judge will someday sit in judgment over one or more jurors.  We believe this rule would be too restrictive and not in the spirit of Hoover.  Judges are to use various factors to determine if a change of venue is necessary for a fair trial.  We conclude that the Defendant has not shown a clear abuse of discretion on the part of the trial court, in part, because he has not established that "the jurors who actually sat were biased and/or prejudiced."

-12-

<u>Davidson</u>, 121 S.W.3d at 612. The Defendant was able to voir dire the jurors, and, although they may have known Judge Ross, there is no indication they were biased or prejudiced. The Defendant is not entitled to relief on this issue.

## D. Inspection and Testing

The Defendant alleges that the trial court erred in not allowing the Defendant to inspect and test the audio tape recordings.[8] The Defendant alleges that he made a motion before trial to inspect the audio recordings, and this motion was never ruled upon. During trial, the Defendant did not object to the playing of the audio tapes, but he merely objected to the transcripts that were given to the jurors. After trial, the Defendant "renewed" his request to inspect the audio tapes for tampering. This request was denied.

Tennessee Rule of Criminal Procedure 16(a)(1)(F) states, "Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph . . . tangible objects . . . if the item is within the state's possession, custody or control" and either the item is material to the defense or intended to be used in the State's case-in-chief. The precise wording of the Defendant's pre-trial motion was, "Now comes defendant, Jerral Parris, and request[s]: (1) A copy of any and all audio and video recordings developed by Marty McGinnis at the Tami Ross offices during 2004." In his pre-trial motion, the Defendant did not ask to inspect the tapes, he merely asked for a copy of the tapes. At trial, the Defendant admits that no objection was made regarding the tapes themselves. Finally, after trial, the Defendant asked to inspect the original tapes for possible tampering. But, in the discussion with the trial court, the Defendant admitted he was given a copy of the tapes — precisely what he asked for. Because the Defendant did not raise this issue until after trial, the issue is waived. Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). The Defendant is not entitled to relief on this issue.

## E. Mistrial

The Defendant argues error on the part of the trial court in not declaring a mistrial after a State's witness, Judge Ross, compared the Defendant to J.B. McCord. Specifically, defense counsel questioned Judge Ross about why he believed his wife, Tami Ross, was in physical danger:

**Defense Counsel**: Was there ever any threat of physical harm?

**Judge Ross**: Yes, there was to my wife.

**Defense Counsel**: Was there any threat of physical harm to her?

---

[8]The State declined to address this issue in its brief.

**Judge Ross**: Yes, there was.

**Defense Counsel**: Where was that, please?

**Judge Ross**: In her office.

**Defense Counsel**: When was that?

**Judge Ross**: I guess a month or so before he came in her office [he] pointed his finger at her, [and] told her she was at risk. She told him to leave the office. He refused. She had to call the police and[,] before he left[,] he managed to give her a card and said, ["]here give [this] to the police[,"] and she wrote him a letter and said[, "]don't you ever come in my office again[,"] and he never came in her office again until he delivered this [package] to me, sir. Yes, I was concerned about physical violence and threats from this man.

**. . . .**

**Defense Counsel**: And you were assuming, of course, that means physical harm and I think you're entitled to that?

**Judge Ross**: I certainly am entitled to do that because I think that's exactly what he meant.

**Defense Counsel**: And you think that's exactly what he meant?

**Judge Ross**: Yes.

**Defense Counsel**: And that's based on what?

**Judge Ross**: Well, it's based on prior cases I've worked. I worked a murder of an attorney right over here across the street in a very similar situation with a man very similar to this guy who had a problem over a deed who walked in and shot him five times in this office on a morning. Very similar situation, very similar man. *In fact, we talked about it and all the officers agreed, this man is just like J.B. McCord.* That's what I was concerned about. I was concerned about this but see this was a crime when it started he didn't have to do anything else. After that I was concerned about - - (emphasis added)

Defense counsel then stopped his cross-examination and moved for a mistrial claiming the Defendant could not receive a fair trial after he was gratuitously compared to a notorious murderer. The State argued that the witness was merely responding to the question about why he felt his wife was in danger. The trial court agreed, stating, "I think you did ask him why he felt that way and he

told you." Although the trial court refused to declare a mistrial, it instructed the jury not to consider the testimony comparing the Defendant to J.B. McCord.

The decision to grant a mistrial is within the sound discretion of the trial court. State v. Robinson, 146 S.W.3d 469, 494 (Tenn. 2004). A mistrial should be declared "upon a showing of manifest necessity" and should be granted when "the trial cannot continue, or a miscarriage of justice would result if it did." Id. (citing State v. Saylor, 117 S.W.3d 239, 250-51 (Tenn. 2003) and State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)). In order to reverse, we must find a clear showing of abuse of discretion. Id. (citing State v. Reid, 91 S.W.3d 247, 279 (Tenn. 2002)).

In the present case, the testimony comparing the Defendant to a murderer was in response to a question from defense counsel. The witness was asked why he felt his wife was in danger, and he responded that he knew of other dangerous men to whom he felt the Defendant was similar. We note that the comment was in response to a defense question, and a prompt curative instruction was given. We presume juries follow curative instructions. Reid, 91 S.W.3d at 279; State v. Stout, 46 S.W.3d 689, 715 (Tenn. 2001). Thus, we conclude the Defendant has not shown by clear evidence an abuse of discretion on the part of the trial court, and he is therefore not entitled to relief on this issue.

### F. Jury Instructions

Next, the Defendant alleges error on the part of the trial court claiming the trial court failed to properly instruct the jury. The Defendant requested that the jury be instructed on the affirmative defense for extortion found in Tennessee Code Annotated section 39-14-112(b). It states, "It is an affirmative defense to prosecution for extortion that the person reasonably claimed: (1) Appropriate restitution or appropriate indemnification for harm done; or (2) Appropriate compensation for property or lawful services." Id. When the Defendant asked the trial court to instruct the jury on the affirmative defense, the court stated, "I'm going to note your objection but I don't think the evidence in this case preponderates in favor of finding that they met either one of those burdens of why he was claiming restitution or what ever it was on a legitimate basis. Note your objection."

"The general principle in criminal cases is that the trial judge has a duty to give a complete charge of the law applicable to the facts of the case, and the defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge." State v. Frank Peake, III, No. M2005-01674-CCA-R3-CD, 2006 WL 929296, at *8 (Tenn. Crim. App., at Nashville, Apr. 11, 2006) (citing Poe v. State, 370 S.W.2d 488, 489 (1963)), *perm. app. denied* (Tenn. Aug. 21, 2006). It is reversible error for a trial court to fail to instruct the jury on all the applicable issues, including the theory of the defense. See Poe, 370 S.W.2d at 489-90 (holding that failure to give instruction on an alibi defense was reversible error); Davis v. State, 64 Tenn. 612, 612 (1875) (same). For a trial court to instruct a jury on an affirmative defense the Defendant need only "fairly raise" the issue and provide notice of the affirmative

defense. T.C.A. § 39-11-204(d) (2006).[9]

It appears that the trial court misapplied the burden of proof by stating that the Defendant needed to prove his affirmative defense by a preponderance of the evidence for an instruction on the defense to be submitted to the jury. There are two burdens at issue. First, the Defendant needed to "fairly raise" the issue. Once "fairly raised," the jury should be instructed on the affirmative defense. Then, the jury could acquit the Defendant if the jury determined that the affirmative defense was proven by a preponderance of the evidence. Id. at (e); State v. Hood, 868 S.W.2d 744, 748 (Tenn. Crim. App. 1993).

The facts in this case lead us to conclude the affirmative defense was "fairly raised," and the jury should have been instructed on the issue. Here, the applicable question is, did the Defendant present evidence that fairly raises the question of whether he had a reasonable claim of appropriate restitution for harm done. The record shows that this dispute arose out of a divorce that turned out unfavorably for the Defendant. The Defendant felt he was wronged by both the divorce court judge and his ex-wife's lawyer, Tami Ross. The Defendant inquired into the possibility of a more favorable settlement, to which Tami Ross responded that there was no incentive for her client to settle. She told the Defendant his only option was to appeal the divorce. Then, the Defendant delivered the package with his "incentives." We conclude this evidence "fairly raises" the proposition that the Defendant reasonably believed that there was "harm done" to him, and his demands were "appropriate restitution." This issue should have been submitted to the jury for them to determine if the Defendant proved by a preponderance of the evidence that his actions were a result of a reasonable claim for appropriate restitution for harm done. It was reversible error not to instruct the jury on the affirmative defense. Notwithstanding the determination that this case should be reversed and remanded because of the forgoing error, we will address the remainder of the Defendant's claims so as not to pretermit any issue.

### G. Sentencing

The Defendant next contends that his sentence of 210 days in the county jail violates the Tennessee Code Annotated section 40-35-501(a)(3) proscription against serving more than thirty percent of his effective one-year sentence. The State concedes this error. We agree this is error based on the statute requiring the Defendant's sentence to be suspended upon him reaching his release eligibility date prior to him serving 210 days. T.C.A. § 40-35-501(a)(3) (2006). Because of this error, we conclude the case would have to be remanded for the re-sentencing of the Defendant, even if a new trial was not required.

---

[9]The statute also requires the Defendant to give notice of the affirmative defense no later than ten days before trial. § 39-11-204(c). The record shows the Defendant gave this notice on April 22, 2005, and the trial began on October 7, 2005.

### III.  Conclusion

In accordance with the foregoing reasoning and authorities, we reverse the judgments of the trial court and remand the case for a new trial.

_____
ROBERT W. WEDEMEYER, JUDGE