IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 27, 2017

## STATE OF TENNESSEE v. LISA KAY YOUNG

**Appeal from the Criminal Court for White County**
**No. CR-6528C          David A. Patterson, Judge**

_____

### No. M2016-01149-CCA-R3-CD

_____

The Defendant, Lisa Kay Young, appeals as of right from her convictions for one count each of first degree premeditated murder, second degree murder, and aggravated assault. The Defendant contends (1) that the trial court erred by refusing to admit statements by Miranda Brown, one of the Defendant's co-defendants; and (2) that this court should vacate or merge the Defendant's convictions for second degree murder and aggravated assault with her conviction for first degree premeditated murder. Following our review, we conclude that the trial court erred in preventing the Defendant from admitting Ms. Brown's statements as evidence and that this error was not harmless. Accordingly, we reverse the judgments of the trial court and remand the case for a new trial. With respect to the Defendant's remaining issue, we will address that issue so as not to pretermit it. See State v. Parris, 236 S.W.3d 173, 189 (Tenn. Crim. App. 2007) (following a similar procedure).

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed; Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT L. HOLLOWAY, JR., JJ., joined.

Michael J. Rocco, Sparta, Tennessee, for the appellant, Lisa Kay Young.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Senior Counsel; Bryant C. Dunaway, District Attorney General; and Phillip A. Hatch and Bruce MacLeod, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

This case arises from the murder of the victim, Jill Farley, on February 9, 2014. The following day, Miranda Brown and Brian Logan were arrested for the victim's murder. The Defendant was arrested almost a year later on January 5, 2015, when police officers found incriminating text messages from February 9, 2014, on one of the Defendant's cell phones. The White County Grand Jury indicted the Defendant for one count each of first degree premeditated murder, first degree felony murder, and aggravated robbery. See Tenn. Code Ann. §§ 39-13-202, -402. The trial court addressed a motion in limine on April 25, 2016, and a jury trial began on April 26, 2016.

### Motion in Limine Hearing

Prior to trial, the State filed a motion to exclude out-of-court statements made by Miranda Brown regarding the murder of the victim. The Defendant argued that there were portions of a statement Ms. Brown gave to police on February 10, 2014, that were exculpatory for the Defendant. These statements included Ms. Brown's assertions that, using the Defendant's cell phone, she contacted the victim and set up a meeting with her on February 9, 2014. Furthermore, Ms. Brown told the investigating police officers that the Defendant was not involved in the events that transpired on February 9, 2014.

Ms. Brown was called to testify. However, she invoked her right under the Fifth Amendment to remain silent. The trial court determined that Tennessee Rule of Evidence 804 applied to these statements and that Ms. Brown was unavailable because "she [was] exempted on the grounds of privilege from testifying concerning subject matter of the declarant's statement." The trial court further explained that the pivotal issue was determining whether Ms. Brown's statements were a declaration against interest. The trial court concluded that Ms. Brown's statements were not statements against interest but rather inadmissible hearsay and ruled that the Defendant would not be able to admit these statements at trial.

### Jury Trial

Kevin Friedberg testified that he was working as the manager of "the Dollar General on Roberts Matthews Highway on February 9, 2014." Mr. Friedberg said that he went outside into the parking lot around 7:45 p.m. that evening. As he walked around collecting carts, he noticed "a white vehicle parked right up front towards the store." When asked what else he observed, Mr. Friedberg stated,

> When I looked in the direction of this vehicle, that's when I noticed a lot of commotion. There w[ere] three individuals in the vehicle, one in

-2-

the driver[']s seat, one in the front passenger, and one in the back seat. The individual in the back seat was, there was a lot of movement, there was a lot of bouncing from directly behind the driver[']s seat to the middle of the back seat and then back and forth. That's what caught my attention, so I started to walk toward the vehicle. I then noticed that the person in the back seat with all the moving around actually was doing a swinging motion towards the person in the driver[']s seat. Overhead actual swinging. I could tell that that person was hitting the person in the driver[']s seat, so I continued to walk behind the vehicle. I walked towards the passenger side, but I was still in the rear. And at that point, the front passenger side door opened and a lady exited the car.

Mr. Friedberg said that he "looked face to face" with the woman "for a brief moment." He explained that the woman he saw was "shorter than [he] was" and had "brownish blond" or "dirty blond" hair. After exchanging a look with this woman, Mr. Friedberg "decided to walk away from the vehicle back to [his] original standing position."

Mr. Friedberg also said that he noticed a "van parked back into the parking lot[.]" Mr. Friedberg identified a photograph of the van he saw that evening, and it was entered into evidence. Mr. Friedberg said that after noticing the parked van, he began walking back towards the store. He stated,

I turned around and looked back towards the car to see what was going on at that point. At that time, the back driver[']s side door was open and there was a man exiting the car. He was standing with that door open. I saw him shut the door and walk around to the open door on the front passenger side.

Mr. Friedberg described the man as having "short white hair" and "a brown Carhart[t] type jacket." Mr. Friedberg said,

I watched [the man] walk around the back of the vehicle to the passenger side. At that point I do remember someone reaching into the vehicle and that would have been like the front seat. And then that's when, I'm assuming I turned away at that point, because the next visual I have is those individuals have gone and the van is leaving the parking lot.

When asked if he remembered the color of the van, Mr. Friedberg replied that it was "a light colored minivan." Mr. Friedberg stated that the van left the scene traveling "at a really fast speed." Mr. Friedberg went back inside the store and "tried to take an inventory of the people that were in the store, the customers." He explained that he wanted to determine "who had been in there long enough to maybe be partnered up to

that white car, trying to see who was leaving, who wasn't[.]" Mr. Friedberg asserted that he "wasn't satisfied with letting it go [be]cause [he] didn't know anything else, but obviously [he] had seen something that . . . made [him] feel very uncomfortable."

Mr. Friedberg testified that after being in the store for approximately fifteen minutes, he decided to walk outside and check on the white car again. He stood on the sidewalk near the front door of the store and observed that "the windows were fogged up," and assumed that "whoever was in there" was okay because the fog on the windows indicated that the person was breathing. Mr. Friedberg returned to the store and continued "kind of watching people" inside. He said that after approximately forty-five minutes, the white car remained in the parking lot and he walked back outside. Mr. Friedberg said that he approached the vehicle and

> saw the female that was in the front driver[']s seat, she was slumped over towards the door and I could see [the] side of her . . . head[,] and it was covered in blood. There was blood trailing down her face and onto her shoulder.

Mr. Friedberg said that he "realized it was indeed the worst" and returned to the store where he "had pinpointed somebody that was in the store the length of time that [he] could relate to the car being there." Mr. Friedberg told this woman what he had seen, and the two went outside to the vehicle. Mr. Friedberg explained that the woman began screaming the victim's name, that she opened the car door, and that he heard the victim make "a slight moan" and heard "a very definite gasp for air." Mr. Friedberg also testified that the woman told him that the woman's purse had been stolen. Mr. Friedberg then called 9-1-1.

Officer Mike Honaker testified that he was employed with the Sparta Police Department and that he was working "in that official capacity on February 9[], 2014 into the late hours and February 10[], 2014 early morning hours." He said the other officers were "on [the] lookout for a green Plymouth minivan" and that they found the vehicle on "Bochman Way." Officer Honaker said that officers pulled over the van and that the van's driver "pulled in the Midway [M]otel." Officer Honaker said that he arrived at the motel at approximately the same time. He stated that the tag number on the van belonged to Miranda Brown. Officer Honaker said that he got out of his car and approached the van. He asked the driver, Brian Logan, to "step out of the vehicle" and detained him. Officer Honaker described Mr. Logan as "shorter" with "short sandy hair." He also said that Mr. Logan was wearing "light color overalls." Another man was in the "front passenger seat" of the vehicle with Mr. Logan. When asked if anyone else was present "at the scene that evening[,]" Officer Honaker said that Ms. Brown and the Defendant "had come out of a motel room[.]"

-4-

Agent Dan Friel testified that he was employed as a special agent with the Tennessee Bureau of Investigation (TBI). He explained that it was his duty to supervise crime scenes. Agent Friel said that he was working in that capacity on February 9, 2014, and that he responded to a crime scene at the Dollar General Store in White County. Agent Friel viewed a photograph of a "white Toyota Corolla" previously marked as an exhibit and identified it as the vehicle he found at the Dollar General Store on February 9, 2014. Agent Friel testified that he observed "a large amount of blood on the seat, on the back seat, in between the back seats," and blood "around the . . . odometer, the speedometer, the front dash, and a little bit on . . . the roof of the vehicle." He also saw a "Motorola cellular phone" and "a purse" in the driver's seat. Agent Friel said that he found blood on the outside of the phone and that he was able "to access that phone" or "get into that phone so to speak." Agent Friel testified that he confirmed the phone belonged to the victim. Also, he determined that text messages had been sent from the victim's phone to telephone number 8572.[1] Agent Friel testified that the last text message sent from the victim's phone was at "[a]pproximately 7:47 p.m." and that the Defendant's name was on the screen as the contact to whom the text message was sent. Agent Friel also testified that after examining the blood spatter in the car and reviewing Mr. Friedberg's statement, he determined that the person who struck the victim was sitting "directly behind her in the vehicle." Agent Friel said that he obtained a swab of blood from inside the vehicle and determined that the blood belonged to the victim.

Agent Friel also testified that during his investigation, he obtained a description "of the van that was seen leaving the [D]ollar [General S]tore parking lot." He said that it was "a dark colored minivan." Agent Friel also had the opportunity to "review surveillance images from the . . . gas station next to the Dollar [General] Store." Agent Friel said that on the surveillance video, he saw the victim's "white Toyota Corolla pulling into the Dollar General Store" at 7:44 p.m. After viewing a still photograph taken from the surveillance video, Agent Friel testified that the photograph depicted "a dark colored . . . Plymouth Voyager minivan backing into the parking area." Agent Friel then viewed a photograph of "that van . . . leaving the parking lot." He said that based upon the time stamps on the recording, "the minivan back[ed] into the Dollar General at 7:47 [p.m.]" and "le[ft] at 7:51 [p.m.]." Agent Friel said that the information he learned from the surveillance video was consistent with Mr. Friedberg's statement. Agent Friel said that it was approximately 4:00 a.m. when the minivan was "pulled over at the Midway Motel." Agent Friel traveled to the Midway Motel and saw "Brian Logan and [another man] sitting . . . on the ground" and "Miranda Brown and [the Defendant] standing in front of Room 19." He described Mr. Logan as "a little guy . . . probably five three, five four." Agent Friel said that Mr. Logan was "wearing some brown coveralls" and "a

---

[1] For purposes of anonymity and clarity, we will refer to telephone numbers using the last four digits only.

jacket" and had "short blond hair." Agent Friel also noticed that there were "little specks of blood . . . on his coveralls."

Agent Friel testified that he spoke with the Defendant at the Midway Motel. He stated that the Defendant was located "in Room 19 of the Midway Motel[,]" along with her children and Ms. Brown's children that evening. According to Agent Friel, the Defendant told him that she had been staying at the Midway Motel and confirmed that her "telephone number was . . . 8572." Agent Friel explained that he asked the Defendant about that telephone number "because [8572] was the last phone number that texted" the victim. Agent Friel testified that the Defendant informed him that she had a second telephone with the number 7566. The Defendant also told Agent Friel that she "didn't even know who [the victim] was" and that Ms. Brown "took her phone" with the 8572 number. The Defendant also told Agent Friel that Ms. Brown drove a "green Plymouth Voyager minivan."

Agent Friel testified that during his investigation, he requested "the preservation of [the] cellular phone records." Specifically, he obtained records for telephone numbers 8572, which belonged to the Defendant, and 8213, which belonged to the victim. Agent Friel testified that he was also able to determine that the telephone number 6022 belonged to Ms. Brown. Using the records obtained from Verizon for February 9, 2014, Agent Friel created a spreadsheet containing text messages using those telephone records, and this was entered into evidence. The following chart depicts the content of these text messages[2]:

| Time P.M. | Sender | Recipient | Message Content |
|---|---|---|---|
| 7:44 | 8572 Defendant's phone | 7570 Unknown | Midway room 19\n YERT !! |
| 7:49 | 8572 Defendant's phone | 8213 Victim's phone | I dont know what up with you but you need to answer me tell me sometim i got 800 dollar wish you could meet me\n YERT !! |

[2] We note that Agent Friel testified that the Verizon records he used to create this chart were given in the Eastern Time Zone. However, he testified the events of this case occurred in the Central Time Zone; thus explaining the apparent discrepancy in time.

| Time | From | To | Message |
|---|---|---|---|
| 7:50 | 8213 Victim's phone | 8572 Defendant's phone | Do u have the 260 u owe me |
| 7:53 | 8572 Defendant's phone | 8213 Victim's phone | Yeah i do and plus more all together now I have 1200 so i let you know when I on my way I am up mount rite now so I be a few\n YERT !! |
| 7:54 | 8213 Victim's phone | 8572 Defendant's phone | Hurry cause I got to go to crissville |
| 8:18 | 8213 Victim's phone | 8572 Defendant's phone | How long you gonna be |
| 8:18 | 8572 Defendant's phone | 8213 Victim's phone | Hour and half\n YERT !! |
| 8:19 | 8213 Victim's phone | 8572 Defendant's phone | I see u when i get back then |
| 8:23 | 8572 Defendant's phone | 8213 Victim's phone | It may not be that long can you come this way now and my lady will meet you now please she got 1200 take off what ever and give her the rest\n YERT !! |
| 8:28 | 8572 Defendant's phone | 8213 Victim's phone | Let me know k she ready on way\n YERT !! |
| 8:29 | 8213 Victim's phone | 8572 Defendant's phone | Meet me at dollar store by chevron. How long. I'm leaving now |
| 8:30 | 8572 | 8213 | She be there in 10 |

| | Defendant's phone | Victim's phone | her van\n YERT !! |
|---|---|---|---|
| 8:37 | 6022 Ms. Brown's phone | 8572 Defendant's phone | I think I should do this |
| 8:38 | 8572 Defendant's phone | 6022 Ms. Brown's phone | Ask him to make sure he can k and you just get out to talk to her yall talk about it and go from there\n YERT!! |
| 8:40 | 6022 Ms. Brown's phone | 8572 Defendant's phone | He got a hammer says he do it but look nervous |
| 8:44 | 8572 Defendant's phone | 6022 Ms. Brown's phone | K tell him do it fast\n YERT !! |
| 8:46 | 8213 Victim's phone | 8572 Defendant's phone | Where u at |
| 8:46 | 6022 Ms. Brown's phone | 8572 Defendant's phone | Gettin off exit |
| 8:46 | 8572 Defendant's phone | 8213 Victim's phone | She fixin to pull up I tex her\n YERT !! |
| 8:47 | 8572 Defendant's phone | 6022 Ms. Brown's phone | She there let me know\n YERT !! |
| 8:47 | 8213 Victim's phone | 8572 Defendant's phone | Who's she |
| 8:52 | 6022 Ms. Brown's phone | 8572 Defendant's phone | Done |
| 8:53 | 8572 Defendant's phone | 6022 Ms. Brown's phone | Oh lord yall did \n YERT !! |
| 8:54 | 6022 Ms. Brown's | 8572 Defendant's | Yes. An I think she dead |

-8-

| | | | |
|---|---|---|---|
| | phone | phone | |
| 8:56 | 8572 Defendant's phone | 6022 Ms. Brown's phone | He can watch the kids while me and you run somewhere ok we give him sometim ok I tell him when yall get here are you ok \n YERT !! |
| 8:59 | 6022 Ms. Brown's phone | 8572 Defendant's phone | Yes mama I am |
| 9:07 | 6022 Ms. Brown's phone | 8572 Defendant's phone | Bout pull in |

Detective Christopher Isom testified that he was employed with the White County Sheriff's Department and that his primary job duty was to conduct criminal investigations. Detective Isom testified that he helped investigate the victim's murder and established a timeframe during which the murder may have occurred. Detective Isom viewed the surveillance video from the Airport Marathon gas station. He explained that based upon this preliminary investigation, he believed that the victim was killed "between 7:43 [p.m.] and 7:51 [p.m.]" Detective Isom said that the "city police had found the van at Midway Motel" and that he traveled there to continue his investigation. He said that Ms. Brown, Mr. Logan, and the Defendant were all at the motel.

Detective Isom stated that he did not speak to the Defendant on February 9 or 10, 2014, but he interviewed her later on January 5, 2015, regarding the victim's murder. Detective Isom stated that the Defendant denied having knowledge that Mr. Logan and Ms. Brown "were traveling to the Dollar General Store" on February 9, 2014. Detective Isom also interviewed the Defendant upon her request on January 12, 2015, and a recording of this interview was entered into evidence. At this second interview, Detective Isom informed the Defendant that he "had her cell phone in evidence[.]" Detective Isom said that the Defendant "remembered a text" from the victim and that Ms. Brown "was using her phone" on February 9, 2014. The Defendant also told Detective Isom that she had communicated with Mr. Logan and Ms. Brown on their way to the Dollar General Store to meet the victim. However, the Defendant repeatedly insisted that she did not have the cell phone with number 8572. She explained that if she had been exchanging text messages with Ms. Brown, then she would have done so using her "free phone" and not the phone with number 8572.

Despite the Defendant's assertions about using a different phone, Detective Isom testified that the text messages the Defendant admitted to receiving from Ms. Brown contained similar content to the text messages received on phone 8572 on February 9, 2014. For example, Detective Isom said that during the interview, the Defendant admitted to receiving a "text message from [the victim] about owing money[,]" and she referenced a text message from Ms. Brown saying, "I think I should do this[.]" Detective Isom testified that the Defendant told him she wanted Ms. Brown to pay the victim. Detective Isom also testified that the Defendant told him she believed Ms. Brown and Mr. Logan were meeting the victim to carry out a drug deal for methamphetamine. However, Detective Isom said that no methamphetamine was found in the victim's car.

Detective Isom stated that the Defendant further admitted that "she received the information from [Ms.] Brown's phone to her phone that [the victim] was dead" on the evening of February 9, 2014. Apparently contradicting herself, the Defendant also asserted during the police interview that the first time she learned of this victim's death was from Ms. Brown at the police station on February 10, 2014. Detective Isom was able to confirm that Detective Capps took the Defendant "in to see Ms. Brown" at the police station on February 10, 2014, and that "some sort of communication was exchanged[.]"

Gavin Patrick stated that he was "a Computer Forensic Examiner at Logic Force Consulting" in Nashville and testified as an expert in digital forensics. He testified regarding cell phone records for telephone number 7566, the free phone which belonged to the Defendant. Mr. Patrick testified that on February 9, 2014, there were no text messages sent from that cell phone between 5:57 p.m. and 9:43 p.m. When asked if he found any text messages on the phone with number 7566 regarding "a hammer," a reference to the victim's death, or containing the word "Lord," he replied, "No." Mr. Patrick also testified that there was the number 6022 listed in the cell phone as the telephone number for Ms. Brown.

Karen Milbrodt testified that she was an employed by Verizon Wireless as a senior analyst. She explained that one of her responsibilities included being a "records custodian." Ms. Milbrodt testified that she was asked to preserve telephone records for February 9 and 10, 2014, for telephone number 8572, a phone number associated with one of the Defendant's cell phones. Ms. Milbrodt said that in response to this request, she created an "Incoming and Outgoing Text Content Log[,]" which contained the content of all of the text messages to and from telephone number 8572. The call log was moved into evidence. She explained that the term "originating DN" indicated the "telephone number that the text message was sent from" and that the term "terminating DN" indicated "the telephone number that the text message was sent to." On cross-examination, Ms. Milbrodt confirmed that there was no way to "tell who sent those

messages" and that the records only indicated the phone number from which the messages were sent.

L.M.[3] testified that the Defendant was his mother and that he was eleven years old on February 9, 2014. When asked what he did on the evening of February 9, 2014, L.M. testified that he was at the Midway Motel. He explained that he left the motel that evening when Ms. Brown drove him in a green van to his grandmother's house "around 6:30, 7:00." He said that on the trip to his grandmother's house, he noticed that the Defendant's phone was "in the middle console." He thought this was "out of the ordinary" and said that he recognized the phone as his mother's by "[t]he picture on the front, the ringtone and on the text messages at the end, it always said yert." L.M. testified that during the trip to his grandmother's home, Ms. Brown used the phone for texting.

Mr. Logan testified that he was incarcerated after he entered a guilty plea for first-degree murder of the victim in this case. He explained that he went to the Dollar General Store on the evening of February 9, 2014, because Ms. Brown "asked [him] to go with her" to "meet somebody for drugs." Mr. Logan said that Ms. Brown "wanted to rob" the victim. He stated that he had only known the Defendant for a short time prior to February 9, 2014, that she did not ask him to go to the Dollar General Store, and that he never discussed the events at the Dollar General Store with the Defendant. He explained that Ms. Brown drove him to the store and that on the way, she was using two cell phones. He further stated that he did not believe that the Defendant and Ms. Brown "were getting along too well" at that time. Mr. Logan also testified that after arriving at the Midway Motel, he remained in a motel room with the children while the Defendant and Ms. Brown left together.

The Defendant testified that she was arrested for the charges in this case on January 5, 2015, approximately eleven months after the victim's murder. The Defendant said that at the time of the murder, she was living at the Midway Motel. She stated that on the evening of February 9, 2014, she was at the motel with her children and stated that Ms. Brown "was in and out." The Defendant explained that Ms. Brown took the Defendant's son to the Defendant's mother's house and then returned to the motel. Ms. Brown then left again. The Defendant stated that she "didn't walk [Ms. Brown] out of the motel room" and that she was not sure if Ms. Brown left with anyone. The Defendant said that after Ms. Brown left the motel, she "went to bed with [her] children" and that they watched "a SpongeBob movie."

---

[3] It is the policy of this court to protect the identity of minor witness. Therefore, we will use initials for the minor involved in this case.

The Defendant said later that night she "was woke up by the law and they [dragged her] out of the room and they brought [her]" to the police station. The Defendant explained that she "spoke with a few different" police officers that night. She said that when asked, she gave her phone number. The Defendant stated that at the time, she had two cell phones: one with number 8572 and the other with number 7566. The Defendant testified that on the evening of February 9, 2014, she was using the phone with number 7566 and claimed that she "hadn't had [the phone with number 8572] in a few days." The Defendant stated that she did not use the phone with number 8572 to text or call anyone on the night of February 9, 2014. The Defendant claimed that she did not send anyone to the Dollar General Store to meet the victim and said that she was not aware anyone was going to meet the victim. The Defendant also denied instructing anyone to rob the victim.

After speaking with the police on February 9, 2014, the Defendant was not charged with any crime and returned home to the motel. The Defendant said that she walked to a store to buy a cord so that she could charge one of her old phones, the phone with number 8572. She explained that she bought "minutes and put . . . that same number on one of my old phones." The Defendant stated that she then used the phone with number 8572 to call someone to take her to her mother's home.

The Defendant explained that during the year before her arrest, she communicated with Ms. Brown. The Defendant stated that she and Ms. Brown "talked and [saw] each other almost every day, when [Ms. Brown] was released from jail" and that they "discussed this case[.]" The Defendant agreed that when she was arrested on January 5, 2015, she gave a statement to the police. The Defendant told the officers that she "felt partly responsible for [the victim's] death[,]" and when asked to explain what she meant by this statement, the Defendant said, "Well if I kn[ew] that [Ms. Brown] was going to go and do such a thing, I wouldn't have put her out of the room. We were just arguing and I just wanted her to leave."

The Defendant agreed that on January 12, 2015, she requested to speak to the authorities. She explained that she "had questions" and that she "didn't understand . . . why [she] was being arrested." When asked if she remembered telling the officers if she remembered a text message regarding "money or something[,]" she replied yes and explained,

> Well throughout the year that me and [Ms. Brown] had talked, she had told me things, that she had sent these texts. And that phone has still, to my knowledge I thought that the law officers here had that [8572] phone. They told me that they did. And when I asked to see it, to view the phone itself with the messages, I still never [have] seen that phone. I still don't

-12-

know where that phone is. But I did put that phone number, I have used that same phone number for probably eight years now, and, but I still don't know where that phone is.

The Defendant also acknowledged that she told the officers during the interview on January 12, 2015, that she might have received a text message about a hammer. However, the Defendant stated that she did not remember receiving such a text message and stated,

[Ms. Brown] told me that she was texting my phone that night, like that. But I guess it's just where they, we talked about it, me and her, and I don't know. But no, sir, I did not receive [any] texts from [Ms. Brown], I didn't even have that phone.

When asked if she received a text message containing the phrases, "oh, lord or oh, honey" and "I think [Mr. Logan] may have killed the girl[,]" the Defendant replied, "No[.]" The Defendant asserted that the phone with the number 8572 was not in her possession at all on the night of February 9, 2014. Regarding the January 12, 2015 interview, counsel for the Defendant asked her if she had "difficulty at the time deciding how [she] had the knowledge that she had, in other words, was it by someone telling [her], someone texting [her], someone phoning [her], what [she] read in the newspaper?" The Defendant responded that the officers were "kindly twisting up [her] words[,]" and she repeatedly told them that she "didn't remember[.]" Additionally, the Defendant asserted that she first learned of the victim's death at the police station "the night that they brought [the Defendant] in for questioning" on February 10, 2014. She claimed that "Officer Capps took [her] in another room and [Ms. Brown] told [the Defendant] what happened."

The Defendant admitted that she had been convicted of a crime involving dishonesty and explained that she pled guilty as an accessory to shoplifting.

On cross-examination, the Defendant admitted to telling Detective Isom that she received a text message regarding a "hammer" but that she did not remember telling Detective Isom she received a message containing the words "Honey" or "Lord[.]" When asked if she was surprised that there were no text messages on her free phone, the 7566 number, between 5:57 p.m. and 9:43 p.m. on February 9, 2014, she replied that she "was asleep at that time." Furthermore, the Defendant claimed that she did not leave the Midway Motel that night with Ms. Brown and asserted that Mr. Logan must have lied when he testified that she did. The Defendant repeatedly asserted that she did not have the phone with number 8572 on February 9, 2014.

-13-

At the conclusion of the trial, the jury convicted the Defendant of one count of first degree premeditated murder, one count of second degree murder, as a lesser-included offense of first degree felony murder, and one count of aggravated assault, as a lesser-included offense of aggravated robbery. At a sentencing hearing, the Defendant was sentenced to five years' incarceration for the aggravated assault conviction and twenty-four years' incarceration for the second degree murder conviction, which were ordered to run concurrently with her sentence of life imprisonment for her first degree murder conviction. The trial court denied the Defendant's motion for a new trial, and she filed a timely notice of appeal to this court.

## ANALYSIS

### I. Issue Requiring Reversal: Hearsay Evidence

The Defendant argues that the trial court abused its discretion when it failed to admit statements made by Miranda Brown regarding the victim's murder. Specifically, the Defendant argues that Ms. Brown's statements were admissible hearsay pursuant to Tennessee Rule of Evidence 804(b)(3) as statements against interest. The Defendant contends that the failure to admit Ms. Brown's statements deprived her of a fair trial because she was prevented "from presenting critical, reliable hearsay evidence[.]" The State responds that the Defendant waived this claim by failing to include the transcript of the police interview in which Ms. Brown made these statements in the record on appeal. Additionally, the State argues that the Defendant's claim has no merit because the trial court properly excluded the statements. The State claims that Ms. Brown's statements were "more than questionable" and that the State "would have been unfairly prejudiced by the inability to cross-examine [Ms.] Brown[.]"

Tennessee Rule of Evidence 103(a)(2) provides that when a trial court's ruling on evidence "is one excluding evidence, the substance of the evidence and the specific evidentiary basis supporting admission" must be "made known to the court by offer or were apparent from the context." In Alley v. State, 882 S.W.2d 810, 816 (Tenn. Crim. App. 1994), a panel of this court held,

> In circumstances in which it is obvious from the record that the proffered evidence could, under no circumstances, be relevant to the issues, a trial court's refusal to grant an offer of proof is not error. However, if the obvious incompetence or irrelevance is not readily apparent from the record, it is error to exclude any reasonable offer which demonstrates the relevance and general import of the excluded evidence.

-14-

Here, the State filed a motion in limine to prevent the Defendant from introducing statements made by Ms. Brown in reference to the victim's murder. The motion stated that the "Defendant may attempt to elicit testimony from witnesses regarding statements allegedly made by [Ms.] Brown regarding the murder of [the victim]." At the pre-trial hearing, counsel for the Defendant testified that there "were certain sections" of a transcript of Ms. Brown's police interview on February 10, 2010, trial counsel "wish[ed] to introduce because [he] believe[d] they [were] exculpatory as to the [D]efendant." Trial counsel argued that such statements were statements against interest and, as such, were an exception to the hearsay rule under Tennessee Rule of Evidence 804(b)(3).

Trial counsel read the following portions from a transcript of the interview:

- Detective Isom: "[The Defendant] or you using [the Defendant's] phone contacts [the victim] to set up this deal, right?"
- Ms. Brown: "[Y]es."
- Detective Isom: "[W]ho does it, you or [the Defendant]?"
- Ms. Brown: "[M]e."
- Detective Isom: "You're using [the Defendant's] phone?"
- Ms. Brown: "Yes, it's in my purse."

Trial counsel also read the following exchange:

- Detective Isom: "How did you get [the Defendant's] phone and where did you get it tonight?"
- Ms. Brown: "I had it[.]"

Trial counsel read a passage regarding the content of text messages:

- Detective Isom: "[W]as anything said on the, in the text messages like I'm sending my girl?
- Ms. Brown: "[M]y lady."
- Detective Isom: "My lady, okay. What was [the Defendant's] involvement tonight?"
- Ms. Brown: "Nothing."

Finally, trial counsel read the following passage:

- Ms. Brown: "I mean, I acted like I was [the Defendant], but I told [the victim] that [the Defendant] was sending me."

Trial counsel made the following argument as to why these statements should be entered as evidence at trial:

-15-

Those are the sections, Judge, that I think are relevant that they, not only are they exculpatory as far as [the Defendant], they basically do go to the [S]tate's case as far as M[s]. Brown's involvement in this particular case, the drug deal, the robbery, the murder and so forth. [Ms. Brown] was in custody at that time, had been brought into the jail. She had been Mirandized prior to this statement, which . . . are things that seem to be relevant . . . as far as the statement. And I think the [S]tate of course, [if] Ms. Brown goes to trial, would seek to use this statement and it would definitely expose her to liability. That's what [Tennessee Rule of Evidence] 804(b)(3) goes to is that the [D]efendant, or in this case Ms. Brown, was aware when she made that statement. She had been questioned for a while when all of those statements were made, so she was aware of what the potential liability was when she made the statement. I think that's the key in this thing. It's not just that [Ms. Brown] incriminates herself, although I think these statements do, given the body.

We just ask the court to allow the particular statements that I have read into the record here to come in in [the Defendant's] case in chief.

The State objected to these particular statements being used at trial, and the trial court ruled that Ms. Brown's statements were excluded and reasoned:

[I]f we look at what [Ms. Brown] is saying and we would put it in the light that this court would understand what it is that it has to do with this case, the court cannot find that this is a confession. The court can find that this is [Ms. Brown] saying that she is setting up a drug deal.

. . . .

It is Ms. Brown saying that she's setting up a drug deal. What she is not saying is I am setting up a ripoff. What she is not saying is we are going there and we are going to commit a robbery. What she's not saying is we're going there and we're going to attempt to steal from [the victim] and beat her and take the drugs and get payback. And what she's not saying is we're going there with the intent to kill [the victim]. And that being the case, what [Ms. Brown] is saying is not acceptable as an out of court statement because it is not against her interest in this case. It is something that the court takes into consideration that she's saying we were going there to do a drug deal. But what the court needs to find is that it tends to show that she is admitting to what happened there, that it is a confession and she's admitting to the fact that they went there to rip her off

-16-

and that they went there and in the midst of that someone is killed. That does not happen, that's not what's being said. And that's what needs to be said from what I see.

"Motions in limine are frequently decided merely on the basis of statements or arguments of counsel setting out the proposed evidence. Although the trial court did not view the videotape or hear proposed testimony at the pretrial hearing, the trial court was adequately informed about the evidence that the State sought to admit at trial when it made its ruling." State v. Denise Dianne Brannigan, No. E2011-00098-CCA-R3-CD, 2012 WL 2131111, at *9 (Tenn. Crim. App. June 13, 2012) (citing State v. W.C. Chambers, No. 74, 1987 WL 18071, at *3 (Tenn. Crim. App. Oct. 7, 1987)). Here, defense counsel read the transcript into evidence; thus, the issue is not waived.

Tennessee Rule of Evidence 804(b) provides that "a [s]tatement against [i]nterest" "is not excluded by the hearsay rule if the declarant is unavailable[.]" Subsection (b)(3) provides a statement against interest is

> [a] statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

"Unavailability of a witness includes situations in which the declarant . . . is exempted by ruling of the court on the grounds of privilege from testifying concerning the subject matter of the declarant's statement[.]" Tenn. R. Evid. 804(a)(1). Furthermore,

> [s]ince the rule requires only that the statement "tended" to expose the declarant to criminal sanctions, a full confession is unnecessary. The statement would qualify as long as it provides evidence that could be used by the prosecution to prove its case against the declarant if a prosecutor were minded to bring charges.

NEIL P. COHEN, ET AL., TENNESSEE LAW OF EVIDENCE § 8.37(3)(d) at 8-177 (6th ed. 2011).

First, we note that it was not necessary for Ms. Brown to make a full confession in order for her statements to qualify as statements against interest in accordance with Tennessee Rule of Evidence 804(b). See id. Thus, the trial court erred in determining that Ms. Brown needed to implicate herself in a robbery of the victim in order for her statements to be admissible.

-17-

The statements made by Ms. Brown fall into five general categories: (1) her admission that she used the Defendant's phone to contact the victim to set up "a deal"; (2) her assertion that she was in possession of the Defendant's phone; (3) her claim that she pretended to be the Defendant and that the Defendant did not send her to meet the victim; (4) her knowledge of the specific content of text messages sent to the victim from the Defendant's phone; and (5) her claim that the Defendant had no involvement in what transpired the night of the victim's murder. In order to determine whether the statements in the police interview were against Ms. Brown's interest, we must examine each specific assertion. See State v. Dotson, 254 S.W.3d 378, 392-93 (Tenn. 2008) (citing Williamson v. United States, 512 U.S. 594, 599-600, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) ("The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts. One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature."); People v. Campa, 686 P.2d 634, 641 (1984) ("[D]eclarations against penal interest may contain self-serving and unreliable information. Thus, an approach which would find a declarant's statement wholly credible solely because it incorporates an admission of criminal culpability is inadequate."); Osborne v. Commonwealth, 43 S.W.3d 234, 241 (Ky. 2001) ("[E]ach statement within the broader narrative must be examined individually to determine whether it is, in fact, self-inculpatory. If not, it is inadmissible.")).

Ms. Brown's assertions that she was in possession of the Defendant's phone and used it to contact the victim to arrange "a deal" are clearly against her penal interest. Ms. Brown was in police custody at the time of this statement and had been given warnings in accordance with Miranda.[4] Ms. Brown would have been aware that she was implicated in the victim's murder, and it was certainly against her interest to claim she set up the meeting with the victim during which the victim was murdered. Furthermore, this corroborates the Defendant's claim that she was not in possession of that particular phone on the night of the murder and that she had given it to Ms. Brown to use. Thus, both claims that Ms. Brown was in possession of the Defendant's cell phone and that she used to it contact the victim meet the requirements of Tennessee Rule of Evidence 804(b)(3) as statements against interest. The trial court erred in preventing the Defendant from entering them into evidence at trial.

Ms. Brown's statement that she pretended to be the Defendant in order to set up a meeting with the victim is also against her penal interest. Ms. Brown admitted to using a false identity in order to set up a deal with the victim. Moreover, it corroborates the Defendant's claim that she never contacted the victim on the night of the murder. Thus,

---

[4] Miranda v. Arizona, 384 U.S. 436 (1966).

this statement meets the requirements of Tennessee Rule of Evidence 804(b)(3), and the trial court erred in preventing the Defendant from presenting it as evidence at trial.

Additionally, Ms. Brown's comments regarding the content of the text messages sent from the Defendant's phone to the victim are against her penal interest. Detective Isom asked Ms. Brown, "[W]as anything said . . . in the text messages like I'm sending my girl?" Ms. Brown responds by correcting Detective Isom and informing him that the text message contained the phrase "my lady" rather than "my girl." Ms. Brown indicated that she had specific knowledge about the content of the text messages sent from the Defendant's phone to the victim. This further supports Ms. Brown's claim that she, not the Defendant, was in possession of the phone used to contact the victim and set up a meeting during which the victim was murdered. This was a statement against interest in accord with Tennessee Rule of Evidence 804(b)(3), and the trial court erred in preventing it from being admitted as evidence at trial.

Finally, we conclude that Ms. Brown's assertion that the Defendant was not involved in any of the events that transpired on February 9, 2014, was also against Ms. Brown's penal interest. It was not in Ms. Brown's interest to rule out a suspect for the victim's murder, for which Ms. Brown was heavily implicated. If the Defendant had instructed Ms. Brown and Mr. Logan to meet with the victim and murder her, it would have been in Ms. Brown's favor to divulge this information to police officers. Also, this statement directly supports the Defendant's claim that she did not participate in the victim's murder. Accordingly, the trial court erred in preventing this statement from being presented as evidence at trial.

Having determined that each of Ms. Brown's statements were statements against interest in accord with Tennessee Rule of Evidence 804(b)(3) and should have been allowed to be offered as evidence at trial, we must determine the effect of the error. The Tennessee Rules of Appellate Procedure provide for harmless error review in such cases. See Tenn. R. App. P. 36(b). Improperly admitted evidence is reviewed under a non-constitutional harmless error analysis. State v. Jeff Carter, No. 2009-02399-CCA-R3-CD, 2010 WL 5343212 at *13 (Tenn. Crim. App. Dec. 16, 2010) (citing State v. Powers, 101 S.W.3d 383, 397 (Tenn. 2003)). In determining whether non-constitutional errors are harmless, "Tennessee law places the burden on the defendant who is seeking to invalidate his or her conviction to demonstrate that the error 'more probably than not affected the judgment or would result in prejudice to the judicial process.'" State v. Rodriguez, 254 S.W.3d 361, 372 (Tenn. 2008) (quoting Tenn. R. App. P. 36(b)). While substantial evidence of the defendant's guilt makes it difficult for "the defendant to demonstrate that a non-constitutional error involving a substantial right more probably than not affected the outcome of the trial," harmless error inquiry "does not turn upon the existence of sufficient evidence to affirm a conviction or even a belief that the jury's

verdict [wa]s correct." Id. at 372. Rather, "the crucial consideration is what impact the error may reasonably be taken to have had on the jury's decision making." Id.

We conclude that the error in failing to admit Ms. Brown's statements was not harmless. The Defendant repeatedly claimed that she was not in possession of the phone with the incriminating text messages and asserted that Ms. Brown was using that phone. In these statements, Ms. Brown not only claims possession of the phone in question, but she also admitted to pretending to be the Defendant in order to set up the meeting with the victim. Furthermore, Ms. Brown stated that the Defendant was not involved in the victim's murder. Ms. Brown's statements directly support the Defendant's assertions at trial. Also, both L.M. and Mr. Logan testified that they saw Ms. Brown in possession of two phones on the evening of February 9, 2014. Moreover, these statements call into question the State's evidence against the Defendant. There is no physical evidence linking the Defendant to the victim's murder, and the text messages from the phone with number 8572 are key to the State's evidence against the Defendant. We conclude that it is more probable than not that admission of these statements would have affected the jury's outcome. Thus, the failure to admit Ms. Brown's statements into evidence resulted in prejudice to the judicial process, and the Defendant is entitled to a new trial.

## II. Defendant's Remaining Issue: Double Jeopardy and Merger

The Defendant argues that the principles of double jeopardy require the trial court to merge or to vacate her convictions for second degree murder and aggravated assault by serious bodily injury with her conviction for first degree premeditated murder. The State responds that the Defendant's convictions for second degree murder and aggravated assault should not be vacated but rather should merge into the Defendant's conviction for first degree premeditated murder "to avoid double jeopardy implications." We agree that the convictions should merge.

Our supreme court has noted that "the long-held recognition that the guilty verdict in the lesser or alternative charge is not mere surplusage but remains a valid jury verdict of guilt that need not be dismissed, vacated, or stricken." State v. Berry, 503 S.W.3d 360, 364 (Tenn. 2015). Additionally, our supreme court has held that "under certain circumstances, two convictions or dual guilty verdicts must merge into a single conviction to avoid double jeopardy implications. For example, merger is required when a jury returns verdicts of guilt on two offenses and one of the guilty verdicts is a lesser-included offense of the other offense." State v. Berry, 503 S.W.3d 360, 362 (Tenn. 2015). "Merger is also required when a jury returns guilty verdicts on counts that represent alternative theories of the same offense." Id. Also, a Defendant can have only one murder conviction for killing a single victim. See e.g. State v. Kiser, 284 S.W.3d 227, 234 n.2 (Tenn. 2009). Furthermore, "when two jury verdicts are merged into a

-20-

single conviction, the trial court should complete a uniform judgment for each count." Id. at 364.

Here, the Defendant's convictions for second degree murder and aggravated assault should merge with her conviction for first degree murder. See State v. Howard, 504 S.W.3d 260, 264 (Tenn. 2016) (holding that "[l]esser-included offenses are to be determined by referring to the express provisions of the statute, and if not specifically mentioned therein, by further applying the guidance of Burns part (b)."); see also State v. Randall T. Beaty, No. M2014-00130-CCA-R3-CD, 2016 WL 6600148, at *29 (Tenn. Crim. App. Nov. 8, 2016), perm app. denied (Mar. 9, 2017) (holding that upon consideration of Howard, "reckless aggravated assault was a lesser[-]included offense of reckless homicide because it contained a statutory element establishing a less serious harm (serious bodily injury versus death) to the same person, [State v. Burns, 6 S.W.3d 453, 466 (Tenn. 1999)], and thus, dual convictions would violate double jeopardy."). Accordingly, the Defendant's convictions should have merged into her conviction for first degree murder.

## CONCLUSION

Based upon consideration of the foregoing and the record as a whole, the judgments of the trial court are reversed, and this case is remanded to the trial court for a new trial consistent with this opinion.

_____

D. KELLY THOMAS, JR., JUDGE

-21-