Filed 6/24/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G051787 |
| v. | (Super. Ct. No. 10ZF0084) |
| JAMES TOLEDANO, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, John Conley, Judge. Reversed.

Thea Greenhalgh and Correen Ferrentino, under appointments by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Kamala D. Harris, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

\*         \*         \*

A jury convicted James Toledano of conspiracy to commit extortion (Pen. Code, §§ 182, subd. (a), 518 [count 1]; all statutory references are to the Penal Code unless otherwise indicated) and attempted extortion (§ 524 [count 2]). Toledano challenges the sufficiency of the evidence to support his convictions, and asserts the trial court misinstructed the jury on extortion and erred in failing to give an instruction on entrapment and a pinpoint instruction on the litigation privilege. We conclude sufficient evidence supported the jury's verdict, but we reverse the judgment because Toledano suffered prejudice in the trial court's decision not to instruct on Toledano's affirmative defense his actions were protected under the litigation privilege.

I

FACTUAL AND PROCEDURAL BACKGROUND

Mrs. M. met Michael Roberts, a personal trainer, around 1997. At the time, she was in a long-term relationship with Mr. M. The couple, who married in 2003, developed a close relationship with Roberts. Mr. M. employed Roberts to manage a gym for his employees, and in 2000 Roberts moved into the M.'s guest house. In addition to providing Roberts with a good job and accommodations, Roberts also received expensive gifts, and contact with the couple's friends and family.

According to Mrs. M., in late 2005, Roberts's demeanor changed and he often was argumentative, angry, and vindictive, which prompted the couple to ask him to move out. Before leaving, he returned an expensive watch Mr. M. had given him.

In April 2006, Roberts called Mrs. M. several times. He blamed her for ruining his life, and he threatened to ruin hers. The phone calls temporarily stopped, but resumed in August 2006. Roberts also phoned other people, telling one person he wanted to tell Mr. M. about his relationship with Mrs. M. Roberts left messages for Mrs. M. threatening to sue her, and warning her," he was "not playing around." The M.'s reported the calls to the sheriff's department.

2

In late November 2007, Toledano, an attorney, wrote Mrs. M. a letter declaring Roberts had retained him to take legal action to end a "three and a half year campaign against" the trainer involving "defamation, improper and unlawful harassment, and constant interference with most aspects of [Robert's] life." The letter claimed Mrs. M. had engineered the trainer's expulsion from his home, and defamed him to his friends and clients by accusing him of being mentally ill, a drug dealer, and a thief. Toledano asserted Roberts "lost a successful business and an annual income over the past three years of approximately $250,000-$350,000 a year." Toledano claimed he would file a civil complaint within 10 days unless he received a response. The letter did not demand a specific sum of money.

Mrs. M. forwarded the letter to attorney Paul Roper. She received a similar letter from Toledano in December 2007 and again forwarded it to Roper, who promised to look into the matter. Roper phoned Toledano, who said he was Roberts's attorney. Roper asked for information to support Toledano's claims, but Toledano responded that everything Roper needed to know was in the letters and Mrs. M. could fill him in on the details. Toledano granted Roper time to meet with Mrs. M. before filing the complaint. In early January 2008, Toledano repeated his earlier accusations in a letter to Roper. Roper decided to "call[] his bluff" and do nothing unless Toledano filed a complaint.

In May 2008, Roberts began calling the M.'s again. The calls, some 60 in all, were "substantially more aggressive" and angry. He left a message on one occasion stating he was going to "fuck [Mrs. M.] up." He also threatened the couple's ranch manager. Mrs. M. believed Roberts might still have a firearm because she saw him with one in the past.

Roper sent Toledano a letter on May 12, 2008, asking him to instruct Roberts to cease his threatening behavior. The M.'s filed a report with the sheriff, hired a personal protection company and obtained a hearing date on their request for a restraining order.

Toledano called Roper on May 27 and requested a meeting for the following day. Toledano claimed he possessed information that would "blow [the couple's case for a restraining order] out of the water," and declared they would not want to proceed once they saw the information.

Roper and his associate met with Toledano at the latter's Newport Beach office on May 28. Toledano insisted Roper's associate, who was handling the restraining order, not participate in the meeting. Once alone with Roper, Toledano asserted Mrs. M. and Roberts had engaged in a long-term affair and he had proof in an envelope containing photographs and letters. Toledano stated if Mrs. M. failed to pay $350,000, an amount he asserted she could obtain without her husband's knowledge, he would disclose the purported affair to Mr. M. and the media. He showed Roper photos and letters he claimed proved she had a long-term affair with Roberts, and he reminded Roper he had subpoenaed Mr. M. to the hearing on the restraining order and therefore Mr. M would hear the details of the affair. He assured Roper the information would destroy the couple's marriage and embarrass Mrs. M. Toledano agreed to continue the hearing to allow Mrs. M time to obtain the $350,000.

Roper reported his conversation with Toledano to Mrs. M., and she agreed to pay the money. Mrs. M. testified Roberts had been a "dear friend," but denied they had an affair. She decided to pay because she feared the scandal ensuing from Robert's revelations would adversely affect her marriage and harm her fundraising ability and her work at the couple's foundation, which raised funds for children's charities.

Roper reported the matter to the Newport Beach Police Department and the district attorney's office. Investigators gave Roper a recording device to use when he held further discussions with Toledano. Roper sent a letter to Toledano stating his "take on this was absolutely right," and Mrs. M. would rather pay the money demand than suffer the ensuing harm if Toledano disclosed the information.

4

Toledano responded to Roper's letter in writing, noting they apparently had come to an agreement as outlined during their earlier meeting. The parties agreed to continue the hearing on the restraining order to June 6, 2008, and they also agreed that would be the day for the payoff.

Over the next week, Roper and Toledano spoke several times about the payment arrangements. Toledano told Roper that Roberts also wanted a watch, and a letter designating the payment as a gift, presumably so the trainer could avoid paying taxes.

Toledano and Roper scheduled a meeting on June 5, 2008, at Toledano's office to arrange details for delivery of the payment the following day. Roper wore a hidden recording device to the meeting, and the tape recording was played for the jury. Roberts also attended the meeting, and they discussed the plan to exchange the documents for the money.

Toledano accepted Roper's offer to pay him $10,000 in attorney fees. Roper based his $10,000 offer on a previous discussion with Toledano, and explained why he selected that amount. "Because I had received a letter that threatened – a complaint with some reasonably sophisticated causes of action referenced . . . So in my mind, if Mr. Toledano had actually done the research that was required of him, in my opinion, to figure out who [Mrs. M.] defamed Mr. Roberts to, what interference there had been with respect to a business advantage, how she had ruined his life, and [Toledano] had done all of that research . . . [M]y calculation in my own head was if he had done all of that work and drafted a complaint, his fees would exceed $10,000." Roper also testified the payment to Roberts, the watch, and Toledano's fees had "nothing to do with the complaint."

The payoff did not occur the next day because the police asked Roper to postpone the meeting until June 13. Toledano wrote Roper "If there is not a chunk of

money and the signed gift letter, the deal is off. [Roberts] is going to pull the plug. He is absolutely beside himself. Not a good situation."

At some point, Roberts advised Roper that Toledano no longer represented him. Call records showed Roberts phoned Roper repeatedly between June 7 and June 13. But Toledano continued to communicate with Roper about the exchange.

The parties agreed the money would be placed in a duffel bag, and delivered on June 13 to a Newport Beach hotel parking lot. The exchange included $200,000 in cash, a cashier's check for $150,000 written to Roberts, and $10,000 in attorney fees for Toledano. Roper faxed Toledano at the latter's request a copy of the cashier's check, gift letter, and a check for Toledano's attorney fees. Toledano told Roper he was too busy to participate in the exchange, but Roberts would be there. Roper and Roberts completed the exchange in the hotel parking lot, which was within the sightline of Toledano's law office. Police officers arrested Roberts, and they found in his possession a key for a safe deposit box containing the photos and documents Toledano had shown Roper.

Officers executed a search warrant at Toledano's office seizing phone records showing the communications between Toledano and Roberts, and a file captioned with Roberts's and the M.'s names. The file contained a copy of the gift letter.

The prosecution called an experienced civil litigation attorney, Doug Degrave, to offer his expert opinion on Toledano's conduct in negotiating the payout to Roberts in the hotel parking lot. Degrave, who reviewed Toledano's files, e-mails, notes, evidence taken from Toledano's computer, and the police reports, testified he found no evidence Toledano had a retainer agreement with Roberts. One billing entry read, "continue drafting complaint," another read "reviewing files," but neither Degrave nor the police found a complaint, draft complaint, legal research or memoranda, files, or any evidence Toledano had investigate Roberts's allegations. Consequently, Degrave found "no evidence" in Toledano's file to support a valid legal claim.

6

Degrave emphasized there was no evidence in the file to support Roberts's claim Mrs. M. caused him to lose numerous business clients, but nevertheless Toledano demanded $350,000 based not on Roberts's damages, but on what Mrs. M. could obtain without alerting her husband, and in exchange for pictures and letters allegedly showing Mrs. M. and Roberts had an affair. Degrave therefore concluded "there's not a good faith belief in the claim itself that it had that value."

Degrave also testified Toledano acted unethically when he threatened to reveal the allegedly compromising photos and letters to the media. Given a set of hypothetical facts based on the evidence, Degrave concluded the arrangement to deliver cash and a cashier's check to Roberts in a hotel parking lot was not a legitimate settlement of a valid legal claim, but "more like hush money."

Toledano's civil litigation expert, Ronald Talmo, testified that Toledano's November 2007 demand letter was a standard cease-and-desist letter in a defamation action. Talmo concluded Toledano did not need proof of damages because Roberts's claim established defamation per se. Talmo explained Toledano's $350,000 cash demand was appropriate because his client wanted cash, and Talmo also explained civil litigators often ask for more in damages than they otherwise could prove. Talmo also noted disclosure of sensitive information before litigation might lead to serious negotiations and therefore is appropriate.

Toledano testified he represented Roberts on an "informal" basis. Mrs. M.'s declaration in support of the restraining order was contrary to what Roberts had told him, and the letters and photos made it appear she had lied under oath. He disclosed the evidence to Roper, but claimed he did not intend to use it in a public forum. Toledano did not recall saying the evidence would "blow the case out of the water," and he denied coming up with the $350,000 figure based on how much money Mrs. M. could obtain without her husband's knowledge. He also denied threatening to have the media at the hearing on the restraining order. He knew Roberts had called a woman named Linda G.,

7

but denied knowing she worked for a local lifestyle magazine. He claimed Roberts fired him between June 6 and June 9, after the restraining order hearing was continued, but he remained involved because he did not abandon his clients. Roper called Toledano several times stating he should be at the exchange, but Toledano did not attend because he wanted out of the case.

Following trial in November 2014, the jury convicted Toledano as noted above.[1] In March 2015, the trial court suspended imposition of sentence and placed Toledano on probation for three years, ordering him to serve nine months in local custody. The court suspended or stayed the probation order pending the outcome of this appeal.

II

DISCUSSION

A. *Sufficient Evidence Supports Toledano's Conviction for Conspiracy to Commit Extortion*

Toledano challenges the sufficiency of the evidence to support his conviction for conspiracy to commit extortion. He asserts no evidence showed he harbored the specific intent necessary for extortion, asserting "[h]e made no threats that would have brought him within the criminal extortion statutes and no evidence was proffered that he knew of the content of [] Roberts' harassing calls to the [M.'s] and their friends, calls that may have constituted unlawful threats." He also asserts the litigation privilege protected any "speech when the communications with the alleged victims here were solely about getting [them] to stop civilly defaming Roberts, to compensate for the lost income Roberts reported to appellant, and to return the letters and pictures from [Mrs. M.] and of [her] and Roberts together."

---

[1] An indictment jointly charged Roberts and Toledano. Roberts pleaded guilty before jury selection.

8

On appeal, we review the record in the light most favorable to the judgment below. (*People v. Elliot* (2005) 37 Cal.4th 453, 466.) The test is whether substantial evidence supports the verdict. (*Jackson v. Virginia* (1979) 443 U.S. 307, 318; *People v. Johnson* (1980) 26 Cal.3d 557, 577-578.) Substantial evidence is defined as evidence that is reasonable in nature, credible, and of solid value. (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) It is the jury's exclusive province to weigh the evidence, assess the credibility of the witnesses, and resolve conflicts in the testimony. (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330 (*Sanchez*).) The appellate court must presume in support of the judgment the existence of facts reasonably drawn by inference from the evidence. (*People v. Crittenden* (1994) 9 Cal.4th 83, 139; see *People v. Stanley* (1995) 10 Cal.4th 764, 792 [same deferential standard of review applies to circumstantial evidence].) The fact that circumstances can be reconciled with a contrary finding does not warrant reversal of the judgment. (*People v. Bean* (1988) 46 Cal.3d 919, 932-933.) Consequently, an appellant "bears an enormous burden" in challenging the sufficiency of the evidence. (*Sanchez*, at p. 330.)

"A conspiracy is an agreement by two or more persons to commit any crime." (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1024; see § 182, subd. (a)(1).) "A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy." (*People v. Morante* (1999) 20 Cal.4th 403, 416.)

The crime of extortion "is the obtaining of property from another, with his [] consent, . . . induced by a wrongful use of force or fear . . . ." (§ 518.) The "elements of the offense are: (1) A wrongful use of force or fear, (2) with the specific intent of inducing the victim to consent to the defendant's obtaining his or her property, (3) which does in fact induce such consent and results in the defendant's obtaining property from

9

the victim." (*People v. Hesslink* (1985) 167 Cal.App.3d 781, 789 (*Hesslink).*) A defendant may induce fear by threatening to expose, or impute to a person "a deformity, disgrace or crime" or "expose a secret affecting him [or her]." (§ 519; see *Flatley v. Mauro* (2006) 39 Cal.4th 299, 326 (*Flatley*).) A "secret" includes a factual matter unknown to the general public, or to some particular portion of it interested in obtaining knowledge of the secret, and "must affect the threatened person in some way so far unfavorable to the reputation or to some other interest of the threatened person [such] that threatened exposure would be likely to induce him through fear to pay out money or property for the purpose of avoiding the exposure." (*Philippine Export & Foreign Loan Guarantee Corp. v. Chuidian* (1990) 218 Cal.App.3d 1058, 1078.) Whether a threatened exposure would affect the victim is a factual question and depends on the nature of the threat and the susceptibility of the victim. (*Ibid.*; see *Stenehjem v. Sareen* (2014) 226 Cal.App.4th 1405, 1424 [threat may be implied from circumstances].) Extortion is a specific intent crime; guilt depends on the intent of the person who makes the threat and not the effect the threat has on the victim. (*People v. Umana* (2006) 138 Cal.App.4th 625, 641.)

      1. Specific Intent to Conspire with Roberts to Commit Extortion

      Substantial evidence demonstrates Toledano conspired with Roberts to extort money from Mrs. M. Roberts informed Toledano about the alleged extramarital affair with Mrs. M., which Toledano relied on in his discussions with Roper, emphasizing the harm Mrs. M. would suffer if Toledano exposed the long-term affair. Roper testified Toledano made clear to him that if Mrs. M. failed to pay, he would use the documents and photos to cross-examine Mrs. M. at the injunction hearing and reveal she engaged in a long-term affair with Roberts. In case Roper missed the point, Toledano announced he had subpoenaed Mr. M. to the hearing, and the Orange County press also would attend. Toledano underscored the matter by asserting the revelation likely would destroy her marriage and humiliate her publicly. Toledano threatened to use Roberts's information,

10

and his position as an attorney, to ruin Mrs. M.'s reputation and marriage unless she paid him and Roberts the money they demanded. Mrs. M. decided to give in to Toledano's demand and pay the money based on her fear, explaining she "felt intimidated, and obviously blackmailed, and felt this had to stop." She feared the harm to her reputation, which helped her raise funds for numerous charitable endeavors. She testified any scandal highlighted in the press, even if baseless, would devastate her ability to raise money from the people and organizations she had cultivated. She also feared the information would harm her marriage.

Substantial evidence also showed Toledano had the specific intent to induce Mrs. M. to pay the $350,000. Toledano explained he demanded $350,000 because that was the amount Mrs. M. could secure without alerting Mr. M. Toledano instructed Roper that Mr. M. should not participate in the payoff. The evidence sufficiently proved Toledano, using his status as a lawyer, specifically intended to induce Mrs. M to pay $350,000.

Toledano argues it was Roberts who made the harassing phone calls to the M.'s, many of which antedated his representation, and "it was Roberts who allegedly threatened to talk with . . . a publisher of a local society publication about the photos and letters he had." He also emphasizes it was Roberts who allegedly asked for $350,000 because that was the amount Mrs. M. could arrange to pay privately without her husband's knowledge. As noted, Toledano told Roper he had information that would "blow" the M.'s case for a restraining order "out of the water." The jury reasonably could conclude the extortion occurred when Toledano linked the threat to disclose damaging information and photos about an alleged intimate and secret relationship between Roberts and Mrs. M. with a demand for money. Toledano warned Roper if the case did not settle he was going to go forward with a restraining order hearing and that the press would be there. The jury reasonably could reject Toledano's testimony he was an unwitting participant in Roberts's scheme to extort money from Mrs. M., or that he

11

brought out documents and photos only to show he could prove Mrs. M. had perjured herself in the declaration supporting her request for a temporary restraining order. Toledano did not simply demand that Mrs. M. withdraw her request for a restraining order, he asked for a large sum of money to settle what the prosecution's expert testified were nonexistent claims (see *post*). Toledano essentially invites us to reweigh the evidence, which we must decline. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

Toledano also asserts no evidence showed he had the specific intent to enter into a conspiracy with Roberts to extort a cash payment from Mrs. M. He basically rehashes his testimony that he did not know the content of Roberts's phone calls, he did not become aware of the calls until after the fact and then told Roberts to stop, he did not threaten to have media at the May 2008 hearing, he did not come up with the $350,000 figure, and claimed Roper came up with the $10,000 figure for attorney fees payable to Toledano.

The jury rejected Toledano's exculpatory account, and substantial evidence supports their decision. Toledano was Roberts's attorney when he made the threats to Roper. The three men met at Toledano's office to discuss the payoff. The evidence shows Toledano brokered the deal, uttered the threats, and Roberts followed through, keeping pressure on Roper and ultimately showing up in the hotel parking lot across from and in view of Toledano's office to pick up the bag of cash. Given the evidence detailing Toledano's conduct at the meetings with Roper, substantial circumstantial evidence exists Toledano had the specific intent to enter into a conspiracy with Roberts to extort the M.'s. (*People v. Donnolly* (1904) 143 Cal. 394, 398 [conspiracy may be shown indirectly by evidence of facts from which jury might infer ultimate fact of conspiracy].) Because there was sufficient evidence Toledano directly participated in the conspiracy, we need not address his claim the evidence was insufficient to support a conviction for conspiracy on an aiding and abetting theory.

12

## 2. Litigation Privilege Would Not Negate Jury's Finding

Toledano argues the litigation privilege set forth in Civil Code section 47 immunizes him from liability for extortion because his communications "were solely about getting the [M.'s] to stop civilly defaming Roberts, to compensate for the lost income Roberts reported to [appellant] . . . ." We disagree.

Civil Code section 47 provides, "A privileged publication or broadcast is one made: . . . (b) In any . . . (2) judicial proceeding . . . ." "The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 212.) "A prelitigation communication is privileged only when it relates to litigation that is contemplated in good faith and under serious consideration." (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1251 (*Action Apartment*).) No public policy supports extending the privilege to persons who attempt to profit from hollow threats of litigation. (*Id.* at p. 1252.) Whether a prelitigation communication relates to litigation that is contemplated in good faith and under serious consideration is an issue of fact. (*Ibid*.) The privilege applies regardless of whether the communication was made with malice or intent to harm, and whether the alleged conduct was fraudulent, perjurious, unethical, or even illegal. (*Blanchard v. DIRECTV, Inc.* (2004) 123 Cal.App.4th 903, 919-920.)

No case has addressed whether the litigation privilege applies in criminal prosecutions for extortion. (See, e.g., *Flatley*, *supra*, 39 Cal.4th at p. 322 [declining to decide whether litigation privilege applies to criminal extortion].) The Attorney General argues it does not. In *Action Apartment*, *supra*, the Supreme Court held that there is no "exception for criminal prosecutions . . . inherent in the litigation privilege itself." (*Action Apartment, supra*, 41 Cal.4th at p. 1245.) Although the high court acknowledged

13

that the litigation privilege did not preclude criminal prosecutions for "perjury (Pen. Code, § 118 et seq.); subornation of perjury (*id*., § 127); criminal prosecution under Business and Professions Code section 6128; false report of a criminal offense (Pen. Code, § 148.5); and 'attorney solicitation through the use of "runners" or "cappers,"'" it explained that those criminal statutes were excepted from the litigation privilege because each of them "is more specific than the litigation privilege and would be significantly or wholly inoperable if its enforcement were barred when in conflict with the privilege." (*Action Apartment, supra*, 41 Cal.4th at pp. 1245-1246.) Here, the criminal statutes prohibiting extortion are not more specific than the civil litigation privilege; one can commit criminal extortion without implicating any litigation-related matter. The enforcement of the criminal extortion statutes would not be rendered significantly or wholly inoperable due to application of the litigation privilege. Thus, the litigation privilege may apply to criminal prosecutions of extortion.

Nevertheless, a reasonable jury could conclude that the litigation privilege does not apply to Toledano's extortionate statements. Threats related to "litigation that is contemplated in good faith and under serious consideration" are protected by the litigation privilege. (See *Asia Investment Co. v. Borowski* (1982) 133 Cal.App.3d 832, 843 ["Even considering the settlement proposal was made in a manner which might be considered a veiled 'threat' we recognize 'this type of language is part of the adversary system, and, as such, is to be anticipated in the course of "heated battle" between adverse parties to proceedings considered to be within the context of "judicial proceedings."'"].) Thus, Toledano's statement he had information that would "blow" the M.'s case for a restraining order "out of the water," by itself, would be privileged. A threat to reveal the information unless the M.'s withdraw the request for a restraining order also would be privileged. However, Toledano's demand for $350,000 to not disclose the alleged long-term affair is not privileged because that demand is not related to the M.'s seeking a restraining order against Roberts.

14

Toledano argues that his extortionate threats in May 2008 were related to contemplated litigation arising from Mrs. M.'s alleged defamation of Roberts, which caused him to lose "approximately $250,000-$350,000 a year" in his desert plant business. Toledano raised these claims in a November 2007 letter to Mrs. M. and in several subsequent communications. (See *Aronson v. Kinsella* (1997) 58 Cal.App.4th 254, 266 ["if the statement is made with a good faith belief in a legally viable claim and in serious contemplation of litigation, then the statement is sufficiently connected to litigation and will be protected by the litigation privilege"].) But other evidence supports the jury's verdict.

When meeting Roper, Toledano did not discuss the civil lawsuit he mentioned in his correspondence, but instead threatened to reveal the alleged affair at the hearing on the injunction unless Mrs. M paid the $350,000 demand. Roper investigated Roberts and found no income from any desert plant business. Degrave, the prosecution's civil litigation expert, opined "no evidence" in Toledano's files showed Roberts had a valid legal claim. Moreover, although not dispositive, the jury reasonably could infer Toledano never seriously contemplated litigation because he never drafted a complaint and Toledano's files did not include a retainer agreement or legal research memoranda. (See *Dickinson v. Cosby* (2017) 17 Cal.App.5th 655, 684 [failure to follow through with litigation threat "give[s] rise to an inference that the demand letter was not sent in connection with litigation contemplated in good faith and under serious consideration"]; see also *Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 36 ["mere potential or 'bare possibility' that judicial proceedings 'might be instituted' in the future is insufficient to invoke the litigation privilege"].) In sum, the jury reasonably could have found Toledano did not seriously consider litigation addressing Roberts's alleged claims, and thus the litigation privilege did not apply to protect Toledano's extortionate communications.

15

B.     *Sufficient Evidence Supports Toledano's Conviction for Attempted Extortion*

Section 524 provides, "Every person who attempts, by means of any threat, such as is specified in Section 519 of this code, to extort property or other consideration from another" is guilty of a crime. "The elements of the crime of attempted extortion are (1) a specific intent to commit extortion and (2) a direct ineffectual act done towards its commission." (*People v. Sales* (2004) 116 Cal.App.4th 741, 749.) Toledano repeats his claims from the preceding section no evidence demonstrated he had the specific intent to commit extortion, and the litigation privilege protected his communication with Roper. He asserts "in any case, he made no threat of unlawful injury, made no accusation of a crime, only communicated lawful facts, and did not intend to expose secrets. (See Pen. Code, § 519.)" Again, sufficient evidence supports the jury's contrary conclusion that Toledano attempted to expose Mrs. M.'s alleged long-term affair to frighten her into paying him money. For the same reasons stated above, the jury also could find the litigation privilege did not protect Toledano's statements. Because there was sufficient evidence Toledano directly participated in the attempted extortion, we need not address his claim the evidence was insufficient to support a conviction on an aiding and abetting theory.

C.     *Special Instruction on Litigation Privilege*

Toledano complains the trial court erred in failing to give the jury the following special instruction: "The law provides that an attorney is allowed to make what could be considered threats if made by another person so long as those threats have any relation to pending or potential litigation, other than a direct threat to cause criminal charges to be filed against another person if money is not paid. If you find that James Toledano made threats against [Mrs. M.], and those threats had any relation to pending or potential litigation and were not a direct threat to cause criminal charges to be filed against her, you must find him not guilty of the crime of extortion." The prosecutor

objected the instruction misstated the law concerning extortion and would confuse the jury. The trial court stated the instruction was too broad, and refused to redraft it.

Upon request, a trial court must give jury instructions "that 'pinpoint[ ] the theory of the defense.'" (*People v. Wright* (1988) 45 Cal.3d 1126, 1137; see *People v. Earp* (1999) 20 Cal.4th 826, 886.) Of course, the court has no obligation to give a legally incorrect instruction. (*People v. Edwards* (2013) 57 Cal.4th 658, 745.)

Although Toledano asserts his special instruction merely reproduced the litigation privilege, we conclude the instruction did not correctly state the law. The instruction was flawed because it fails to instruct the jury that the pending or potential litigation must be "contemplated in good faith and under serious consideration." The trial court, however, had a sua sponte duty to give a correctly phrased instruction on Toledano's affirmative defense that his actions were protected under the litigation privilege. (*People v. Stewart* (1976) 16 Cal.3d 133, 140 (*Stewart*).)

The instruction should have been given in substantially the following form[2]:

"The litigation privilege may be a defense to the charged crimes. The defendant is not guilty of the charged crimes if the litigation privilege applies to his communications. The defendant's communications are protected by the litigation privilege if:

"1. The communication was made in a judicial or quasi-judicial proceeding;

AND

"2. The communication was made by litigants or other participants authorized by law;

---

[2] The language of the proposed litigation privilege instruction tracks language in the Supreme Court's decisions in *Silberg*, *supra*, 50 Cal.3d at p. 212, *Action Apartment*, *supra*, 41 Cal.4th at p. 1251, and *Hagberg v. California Federal Bank* (2004) 32 Cal.4th 350, 361.

AND

"3. The communication was made to achieve the objects of the litigation; AND

"4. The communication had some connection or logical relation to the action.

"Although the litigation privilege applies to communications made in a judicial proceeding, the litigation privilege is not limited to statements made in a courtroom. It encompasses not only testimony in court and statements made in pleadings, but also statements made prior to the filing of a lawsuit.

"A prelitigation communication is privileged only when it relates to litigation that is contemplated in good faith and under serious consideration."

The Attorney General argues the litigation privilege instruction also should include the following language: "The litigation privilege does not apply to communications threatening to disclose a matter unrelated to an alleged injury suffered by the client because those communications exceed the limits of representation of the client." We disagree because the proposed language is likely to confuse the jury in this case. The proposed instruction draws upon language in the Supreme Court's decision in *Flatley*, *supra*. (See *Flatley*, *supra*, 39 Cal.4th at pp. 330-331 ["the threat to disclose criminal activity entirely unrelated to any alleged injury suffered by [attorney's] client 'exceeded the limits of respondent's representation of his client' and is itself evidence of extortion"].) *Flatley*, however, did not address the scope of the litigation privilege, but the scope of the anti-SLAPP statute. Unlike *Flatley*, the threat here was not to disclose criminal activity, which would violate rule 5-100(A) of the California Rules of Professional Conduct. (See *Flatley, supra*, 39 Cal.4th at p. 327.) Disclosure of a noncriminal matter would not necessarily exceed the limits of legal representation. Finally, the proposed instruction is redundant with the other instructions. Communications that are unrelated to the subject matter of the legal representation would

18

fail to satisfy element four – that the communication have "some connection or logical relation to the action." (*Silberg, supra*, 50 Cal.3d at p. 212.)

The Attorney General also argues that any failure to instruct, sua sponte, on the litigation privilege is harmless. Ordinarily, instructional error is assessed under the *Watson* reasonable probability standard. (*Flood*, *supra*, 18 Cal.4th at p. 490; see *People v. Larsen* (2012) 205 Cal.App.4th 810, 830 ["[e]rroneous failure to give a pinpoint instruction is reviewed for prejudice under the *Watson* harmless error standard"].) Toledano argues we must review an erroneous failure to instruct on an affirmative defense relied upon by the defendant and supported by substantial evidence under the *Chapman* beyond a reasonable doubt standard. (See *Stewart*, *supra*, 16 Cal.3d at p. 141 ["'[A] defendant has a constitutional right to have the jury determine every material issue presented by the evidence,' [Citation.] An erroneous failure to instruct on an affirmative defense relied upon by the defendant constitutes a denial of this right.'"]; cf. *People v. Ahmed* (2018) 25 Cal.App.5th 136, 138 & 144 [trial court's erroneous ruling barring defendant from asserting statutory defense to criminal prosecution reviewed under *Chapman*].) We need not determine the proper standard of review because the instructional error was not harmless even under the more lenient *Watson* standard.

An instructional error is prejudicial under *Watson* if there is a reasonable probability that a result more favorable to the defendant would have been reached in the absence of the error. The "'probability' in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*." (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.)

Here, Toledano's files show he conducted an extensive interview of Roberts and met with Roberts on multiple occasions. The record also establish Toledano received information, such as photographs and memorabilia, that supported Roberts's version of events. As late as May 13, 2008, Toledano referenced the defamation lawsuit in a letter to Roper. On these facts, a reasonable jury could find that when Toledano

19

issued his threats on May 28, 2018, Toledano was seriously considering and contemplating in good faith litigation against Mrs. M., and he made the threats to settle that anticipated litigation. The jury, however, was never informed that conduct otherwise criminal is permitted if it falls within the litigation privilege. It never had the opportunity to decide whether the litigation privilege applies to protect Toledano's statements. On this record, there is a reasonable chance the jury would have rendered a more favorable verdict for Toledano had it been properly instructed that the litigation privilege could protect Toledano's communications. Thus, the error is prejudicial even under the *Watson* standard.[3]

III

DISPOSITION

The judgment is reversed.

ARONSON, J.

WE CONCUR:

O'LEARY, P. J.

MOORE, J.

---

[3]   In light of our holding, we need not reach Toledano's arguments concerning other purported instructional errors.

20